NO. 10-10751
IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

---

VILLAS AT PARKSIDE PARTNERS doing business as Villas at Parkside; LAKEVIEW AT PARKSIDE PARTNERS, LIMITED, doing business as Lakeview at Parkside; CHATEAU RITZ PARTNERS, doing business as Chateau de Ville; MARY MILLER SMITH;

Plaintiffs-Appellees

v.

THE CITY OF FARMERS BRANCH, TEXAS

Defendant-Appellant

---

VALENTIN REYES; ALICIA GARCIA; GINGER EDWARDS; JOSE GUADALUPE ARIAS, AIDE GARZA

Plaintiffs-Appellees

v.

THE CITY OF FARMERS BRANCH, TEXAS

Defendant-Appellant

---

On Appeal from the United States District Court
for the Northern District of Texas

---

## PETITION FOR REHEARING *EN BANC*

---

KRIS W. KOBACH
Kobach Law, LLC
4701 N. 130th Street
Kansas City, Kansas 66109
(913) 638-5567

P. MICHAEL JUNG
SCOTT SHANES
WM. C. (TREY) DOWDY, III
Strasburger & Price, LLP
4400 Bank of America Plaza
901 Main Street
Dallas, Texas 75202
(214) 651-4300

ATTORNEYS FOR APPELLANT

## <u>CERTIFICATE OF INTERESTED PERSONS</u>

The docket number is 10-10751.  The style of this case is *Villas at Parkside Partners, et al. v. City of Farmers Branch, Texas*.

The undersigned counsel of record certifies that the following listed persons have an interest in the outcome of this case.  These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

The City of Farmers Branch, Texas
    *Appellant*

Bill Glancy, in his official capacity as mayor of the City of Farmers Branch, Texas
    *Defendant in Related State Court Case*

Harold Froelich, in his official capacity as mayor *pro tem* of the City of Farmers Branch, Texas
    *Defendant in Related State Court Case*

Michelle Holmes, in her official capacity as deputy mayor *pro tem* of the City of Farmers Branch, Texas
    *Defendant in Related State Court Case*

Tim Scott, in his official capacity as a member of the City Council of the City of Farmers Branch, Texas
    *Defendant in Related State Court Case*

David Koch, in his official capacity as a member of the City Council of the City of Farmers Branch, Texas
    *Defendant in Related State Court Case*

Ben Robinson, in his official capacity as a member of the City Council of the City of Farmers Branch, Texas
    *Defendant in Related State Court Case*

Villas at Parkside Partners d/b/a Villas at Parkside
    *Appellee*

-i-

Lakeview at Parkside Partners, Ltd., d/b/a Lakeview at Parkside
    *Appellee*

Chateau Ritz Partners d/b/a Chateau de Ville
    *Appellee*

Mary Miller Smith
    *Appellee*

Valentin Reyes
    *Appellee*

Alicia Garcia
    *Appellee*

Ginger Edwards
    *Appellee*

Jose Guadalupe Arias
    *Appellee*

Aide Garza
    *Appellee*

Guillermo Ramos
    *Plaintiff in Related State Court Case*

P. Michael Jung; Scott Shanes; William C. Dowdy III; and Strasburger & Price, LLP
    *Counsel for Appellant*

Kris W. Kobach
    *Counsel for Appellant*

William A. Brewer III; James S. Renard; Michael L. Smith; C. Dunham Biles; and Bickel & Brewer Storefront, PLLC
    *Counsel for Appellees Villas at Parkside Partners d/b/a Villas at Parkside; Lakeview at Parkside Partners, Ltd. d/b/a Lakeview at Parkside; Chateau Ritz Partners d/b/a Chateau de Ville; and Mary Miller Smith*

-ii-

Nina Perales; and Mexican American Legal Defense and Educational
Fund
*Counsel for Appellees Valentin Reyes, Alicia Garcia, Ginger*
*Edwards, Jose Guadalupe Arias, and Aide Garza*

Lisa Graybill; and American Civil Liberties Union Foundation of
Texas
*Counsel for Appellees Valentin Reyes, Alicia Garcia, Ginger*
*Edwards, Jose Guadalupe Arias, and Aide Garza*

Omar C. Jadwat; Lucas Guttentag; Jennifer Chang Newell; and Amer-
ican Civil Liberties Union Foundation Immigrants' Rights Project
*Counsel for Appellees Valentin Reyes, Alicia Garcia, Ginger*
*Edwards, Jose Guadalupe Arias, and Aide Garza*

David Broiles; and Cagle and Broiles
*Counsel for Appellees Valentin Reyes, Alicia Garcia, Ginger*
*Edwards, Jose Guadalupe Arias, and Aide Garza*

/s P. Michael Jung
P. MICHAEL JUNG
Attorney of Record for Appellant

## <u>STATEMENT REGARDING *EN BANC* CONSIDERATION</u>

The panel decision conflicts with decisions of the United States Supreme Court:

- *De Canas v. Bica*, 424 U.S. 351 (1976), and

- *Chamber of Commerce v. Whiting*, 131 S. Ct. 1968 (2011)

and of this Court

- *Doe v. Plyler*, 628 F.2d 448 (5th Cir. 1980), *aff'd on other grounds sub nom. Plyler v. Doe*, 457 U.S. 202 (1982),

- *United States v. Gomez-Moreno*, 479 F.3d 350 (5th Cir. 2007), and

- *United States v. Varkonyi*, 645 F.2d 453 (5th Cir. 1981),

and consideration by the full court is therefore necessary to secure and maintain uniformity of the Court's decisions.

This appeal also involves a question of exceptional importance – the extent to which a state or local government may, consistently with federal law, aid in the enforcement of federal law by restricting the harboring of illegal aliens in rental accommodations within its boundaries. The Supreme Court has addressed the permissible scope of state and local legislation regarding illegal aliens in the cases cited above, and will do so again this term in *Arizona v. United States*, No. 11-182, but none of these cases directly involves the harboring issue.

# TABLE OF CONTENTS

**Page**

Certificate of Interested Persons .................................................................i

Statement Regarding *En Banc* Consideration...........................................iv

Table of Contents ........................................................................................v

Table of Authorities ................................................................................ vii

Statement of the Issues...............................................................................1

Course of Proceedings and Disposition of the Case ..................................1

Statement of Facts.......................................................................................3

Argument and Authorities...........................................................................5

    **I.**     **THE MAJORITY OPINION CONFLICTS WITH TWO DECISIONS OF THE SUPREME COURT.**...................................5

        **A.**    **The Majority Refused to Apply the *De Canas* Definition of a "Regulation of Immigration."** ........................6

        **B.**    **The Majority's Invented Definition of a "Regulation of Immigration" Conflicts With *De Canas* and *Whiting*.** ....................................................................8

        **C.**    **The Majority Ignored the Conflict Preemption Test of *Whiting*.** ..................................................................10

    **II.**    **THE MAJORITY OPINION CONFLICTS WITH PRIOR DECISIONS OF THIS COURT.** ...................................12

        **A.**    **The Majority Opinion Conflicts With *Doe v. Plyler*.**...........12

        **B.**    **The Majority Opinion Conflicts With This Court's Harboring Decisions.** .............................................................13

**III.    THIS    CASE    INVOLVES    QUESTIONS    OF
         EXCEPTIONAL IMPORTANCE.**.................................................14

Conclusion .............................................................................................15

Certificate of Service .............................................................................17

Certificate Regarding Electronic Submission.........................................17

Certificate of Compliance .......................................................................18

Appendix: Majority and Dissenting Opinions

# TABLE OF AUTHORITIES

## Cases

*Chamber of Commerce v. Whiting*,
    131 S. Ct. 1968 (2011).......................................................................... passim

*City of Hazleton v. Lozano*,
    131 S. Ct. 2958 (2011)..................................................................................13

*De Canas v. Bica*,
    424 U.S. 351 (1976)............................................................................. passim

*Doe v. Plyler*,
    628 F.2d 448 (5th Cir. 1980), *aff'd sub nom. Plyler v. Doe*, 457 U.S.
    202 (1982)........................................................................... iv, 12, 13

*Gonzales v. Peoria*,
    722 F.2d 468 (9th Cir. 1983) ...........................................................13

*Johnson v. Sawyer*,
    120 F.3d 1307 (5th Cir. 1997) ...........................................................3

*Lynch v. Cannatella*,
    810 F.2d 1363 (5th Cir. 1987) .........................................................14

*Plyler v. Doe*,
    457 U.S. 202 (1982)................................................................... 9, 13

*Truax v. Raich*,
    239 U.S. 33, 42 (1915) .................................................................10

*United States v. Gomez-Moreno*,
    479 F.3d 350 (5th Cir. 2007) ................................................... iv, 14

*United States v. Rubio-Gonzales*,
    674 F.2d 1067 (5th Cir. 1982) .......................................................14

*United States v. Varkonyi*
    645 F.2d 453 (5th Cir. 1981) ................................................... iv, 14

*United States v. Vasquez-Alvarez*,
    176 F.3d 1294 (10th Cir. 1999) ......................................................15

*Villas at Parkside Partners v. City of Farmers Branch*,
    ___ F.3d ___, 2012 U.S. App. LEXIS 6043 (5th Cir. 2012)................. passim

*Villas at Parkside Partners v. City of Farmers Branch*,
    496 F. Supp. 2d 757 (N.D. Tex. 2007) ............................................3

*Villas at Parkside Partners v. City of Farmers Branch*,
    577 F. Supp. 2d 858 (N.D. Tex. 2008) ............................................3

*Villas at Parkside Partners v. City of Farmers Branch*,
    701 F. Supp. 2d 835 (N.D. Tex. 2010) ............................................1

## Statutes

8 U.S.C. § 1324(a)(1)(A)(iii) ...................................................................14

8 U.S.C. § 1373(c) ............................................................... 4, 5, 11, 12

8 U.S.C. §§ 1101, *et seq.* ...........................................................................5

## Municipal Ordinances

Farmers Branch, Tex., Code of Ordinances § 26-119(A)(1) .....................................5

Farmers Branch, Tex., Code of Ordinances § 26-119(B)(1) .....................................3

Farmers Branch, Tex., Code of Ordinances § 26-119(B)(2) .....................................3

Farmers Branch, Tex., Code of Ordinances § 26-119(B)(5)(h) .............................3

Farmers Branch, Tex., Code of Ordinances § 26-119(B)(5)(i) ..............................4

Farmers Branch, Tex., Code of Ordinances § 26-119(B)(7) .....................................4

Farmers Branch, Tex., Code of Ordinances § 26-119(D)(1)................................4, 7

Farmers Branch, Tex., Code of Ordinances § 26-119(D)(2) .....................................4

Farmers Branch, Tex., Code of Ordinances § 26-119(D)(3)...................... 4, 5, 7, 11

Farmers Branch, Tex., Code of Ordinances § 26-119(D)(4)....................................4

Farmers Branch, Tex., Code of Ordinances § 26-119(E)(4) ...................................2

Farmers Branch, Tex., Code of Ordinances § 26-119(E)(5) ...................................2

Farmers Branch, Tex., Code of Ordinances §§ 26-119(B)(5)(a)-(g)........................3

Farmers Branch, Tex., Ordinance 2892 (May 12, 2007)..........................................3

Farmers Branch, Tex., Ordinance 2952 (Jan. 22, 2008)................................. passim

Farmers Branch, Tex., Ordinance 2952 (Jan. 22, 2008), § 6...................................2

Farmers Branch, Tex., Ordinance 2952 (Jan. 22, 2008), § 7...................................3

## Secondary Sources

Michael Hoefer, *Population Estimates: Estimates of the Unauthorized
    Immigrant Population Residing in the United States: January 2009*
    (January 2010) (available at
    www.dhs.gov/xlibrary/assets/statistics/publications/ois_ill_pe_2009.p
    df).............................................................................................................15

## STATEMENT OF THE ISSUES

The following issues merit *en banc* consideration:

1.     Is a local ordinance prohibiting the harboring of illegal aliens in rental accommodations a preempted "regulation of immigration?"

2.     Is a local ordinance prohibiting the harboring of illegal aliens in rental accommodations impliedly field-preempted?

3.     Is a local ordinance prohibiting the harboring of illegal aliens in rental accommodations impliedly conflict-preempted?

## COURSE OF PROCEEDINGS AND DISPOSITION OF THE CASE

This is a suit challenging the validity of Ordinance 2952 of the City of Farmers Branch, Texas ("the City"). Ordinance 2952 regulates the rental of apartments and single-family residences within the City by requiring each adult tenant to obtain a residential occupancy license, and directing that the license be revoked upon a conclusive report by the federal government that the licensee is an alien not lawfully present in the United States.

The district court held Ordinance 2952 to be impliedly preempted by federal immigration law. *Villas at Parkside Partners v. City of Farmers Branch*, 701 F. Supp. 2d 835 (N.D. Tex. 2010). A panel of this Court affirmed the district court's judgment, over a vigorous dissent. *Villas at Parkside Partners v. City of Farmers Branch*, ___ F.3d ___, 2012 U.S. App. LEXIS 6043 (5th Cir. 2012) ("*Villas II*"). Judge Reavley authored the majority opinion, which was joined by Judge Graves;

Judge Elrod dissented.[1]

The majority and dissent differed not only in their analyses of the preemption issues, but in their approaches to the judicial function. The majority openly embraced a political rationale for its decision. *See Villas II* at 22-23 ("However, the great majority [of illegal aliens] live quietly, raise families, obey the law daily, and do work for our country. For all that they contribute to our welfare, they live in constant dread of being apprehended as illegal aliens and being evicted, perhaps having their families disrupted.").[2] The dissent, in contrast, noted that "[t]his case is not about whether the City of Farmers Branch's housing Ordinance is a wise policy choice. It is not for judges to make that sort of political judgment." *Id*. at 40 (Elrod, J., dissenting). Rehearing *en banc* is thus needed to reaffirm that this Court is "a federal appellate court, not a super-legislature" and is "not vested with plenary authority to re-evaluate the policy choices made by our elected representa-

---

[1]Judge Elrod concurred with the majority in one minor respect: she agreed that two subsections of Ordinance 2952 concerning judicial review (§§ 26-119(E)(4)-(5)) were conflict-preempted, because they permitted a state court to regard a federal determination of a particular alien's immigration status as a "rebuttable presumption" rather than as an undisputable conclusion. *Villas II* at 47-48 (Elrod, J., concurring in part). These provisions are plainly severable from the remainder of the Ordinance under its robust severability clause. *See* Ordinance 2952, § 6.

[2]*See also id.* at 19 (referring to state and local restrictions on illegal aliens as "[t]his increasing treatment – some might say mistreatment – of illegal immigrants around the country"). The majority opinion also gratuitously questioned the City's motivations by suggesting that the purpose of Ordinance 2952 was to exclude "specifically Latinos" from the City, *id.* at 2, despite the fact that the district court did not reach the equal protection issues, *see* 701 F. Supp. 2d at 860.

tives." *Johnson v. Sawyer*, 120 F.3d 1307, 1322 (5th Cir. 1997).

## STATEMENT OF FACTS

Farmers Branch Ordinance 2952 was adopted on January 22, 2008, after an earlier, substantially-different ordinance (Ordinance 2892) requiring verification of tenants' immigration status had been preliminarily enjoined. *See Villas at Parkside Partners v. City of Farmers Branch*, 496 F. Supp. 2d 757 (N.D. Tex. 2007) ("*Villas I*").[3] By its terms, Ordinance 2952 was scheduled to take effect on the 15th day after the final judgment in *Villas I*. Ordinance 2952, § 7.

Ordinance 2952 requires each prospective adult tenant of a rental residential unit in the City to obtain a residential occupancy license. § 26-119(B)(1). To obtain a license, the applicant must submit a one-page form to the City and pay a $5 fee. § 26-119(B)(2). On this form, the applicant must provide basic information such as name, address, date of birth, and country of citizenship, along with the address of the proposed rental premises. §§ 26-119(B)(5)(a)-(g). An applicant who is a United States citizen or national must so declare. § 26-119(B)(5)(h). An applicant who is not a United States citizen or national must either provide an identification number that the applicant believes establishes his or her lawful presence in

_____

[3] The preliminary injunction against enforcement of Ordinance 2892 was later made permanent. *Villas at Parkside Partners v. City of Farmers Branch*, 577 F. Supp. 2d 858 (N.D. Tex. 2008).

the United States or declare that the applicant does not know of any such number. § 26-119(B)(5)(i).

Upon receipt of a completed application and fee, the City's building inspector immediately issues the license, without scrutiny of the information provided. § 26-119(B)(7).  If the applicant has declared himself or herself to be a United States citizen or national, no further action is taken.  In the case of other applicants, the building inspector exercises the City's authority under 8 U.S.C. § 1373(c) to verify the immigration status of the applicant with the federal government.  § 26-119(D)(1).  If the federal government responds that the applicant is a lawfully present alien, no further action is taken.  If the response is inconclusive, no further action is taken unless and until a final verification is received.  § 26-119(D)(3).

If the federal government notifies the City that the applicant is an alien who is not lawfully present, the building inspector issues a deficiency notice.  § 26-119(D)(2).  The applicant then has a 60-day window in which to obtain a correction of the federal government's records and to submit additional information to the federal government.  *Id.*  At the end of that time, the building inspector again queries the federal government pursuant to 8 U.S.C. § 1373(c).  § 26-119(D)(4).  Only if the federal government reports for a second time that the applicant is not lawfully present does the building inspector send a notice of revocation of the residential occupancy license to the applicant and to the landlord.  *Id.*

Ordinance 2952 relies entirely upon the definitions of immigration status provided by federal immigration law, 8 U.S.C. §§ 1101, *et seq.* § 26-119(A)(1). The City must accept the federal government's determination of each alien's status, pursuant to 8 U.S.C. § 1373(c). § 26-119(D)(1). City officials "shall not attempt to make an independent determination of any occupant's lawful or unlawful presence in the United States." § 26-119(D)(3).

## ARGUMENT AND AUTHORITIES

### I.   THE MAJORITY OPINION CONFLICTS WITH TWO DECISIONS OF THE SUPREME COURT.

The greatest conflict between the majority opinion and controlling Supreme Court precedent lies in the majority's purposeful decision to ignore the language of *De Canas v. Bica*, 424 U.S. 351 (1976), a case in which the Court held a California statute prohibiting the employment of unauthorized aliens to be unpreempted.

In *De Canas*, the Court laid out a three-part test for determining whether a state or local regulation affecting immigration is displaced through implied preemption: the regulation is only preempted (1) if it constitutes a "regulation of immigration," *id.* at 355, (2) if Congress expressed "the clear and manifest purpose" of completely occupying the field and displacing all state activity, *id.* at 357, or (3) if the state regulation conflicts with federal laws, such that it "stands as an obstacle to the accomplishment … of the full purposes and objectives of Congress," *id.* at 363. Otherwise, a state or city is free to enact a law that deters illegal immi-

gration or "deals with aliens," and such a law is not preempted.  *Id*. at 355.

The majority holding appears to rest on the dual notions that Ordinance 2952 is a forbidden "regulation of immigration," *see Villas II* at 13-18, and that it conflicts with congressional objectives, *see id.* at 18-21.  But the opinion confuses the two doctrines: "In crafting its conclusion, the majority conflates the distinct doctrines of regulation of immigration and conflict preemption."  *Id*. at 40 (Elrod, J., dissenting).  Moreover, the opinion applies neither doctrine correctly.

### A.     The Majority Refused to Apply the *De Canas* Definition of a "Regulation of Immigration."

In *De Canas*, the Supreme Court explained that a "regulation of immigration" has a very specific, and narrow, meaning for preemption purposes: "[T]he fact that aliens are the subject of a state statute does not render it a regulation of immigration, which is essentially *a determination of who should or should not be admitted into the country, and the conditions under which a legal entrant may remain*."  *De Canas*, 424 U.S. at 355 (emphasis supplied).  Such determinations are committed exclusively to the federal government by the Constitution itself.  *Id.*

The majority opinion conceded that the Ordinance does not fit the *De Canas* definition of a preempted regulation of immigration: "We recognize that the Ordinance here does not literally control the entry and exit of aliens into and out of Farmers Branch or the United States."  *Villas II* at 16.  But the majority openly rejected a literal reading of *De Canas*, saying that "we do not read the quoted lan-

guage from *De Canas* in the same literal and hypertechnical manner as the City." *Id.* The majority instead invented its own definition of "regulation of immigration" out of whole cloth, dismissing the Supreme Court's definition as merely one "category" of a preempted regulation of immigration. *Id.* The dissent sharply criticized this departure from a plain reading of controlling Supreme Court precedent: "[T]he majority concedes that the Ordinance does not determine the entry or exit of anyone into or out of the United States. This should be the end of the regulation of immigration inquiry." *Id.* at 41 (Elrod, J., dissenting).

Ordinance 2952 in no way determines who should or should not be admitted into the country. On the contrary, the Ordinance relies on federal categories of immigration status and the federal government's determination of any particular alien's immigration status. § 26-119(D)(1). Under the Ordinance, City officials "shall not attempt to make an independent determination of any occupant's lawful or unlawful presence in the United States." § 26-119(D)(3). Nothing in Ordinance 2952 can be plausibly construed as an attempt to define which aliens may lawfully enter the United States or Farmers Branch. Nor does Ordinance 2952 determine "the conditions under which a legal entrant may remain" in the United States or Farmers Branch. It is thus not a "regulation of immigration" under the straightforward definition established by the Supreme Court in *De Canas*.

## B.    The Majority's Invented Definition of a "Regulation of Immigration" Conflicts With *De Canas* and *Whiting*.

Instead of following *De Canas*, the majority fabricated a new and unsupported definition of a regulation of immigration:  "[W]e believe that the Ordinance does in fact regulate immigration because it seeks to address directly the presence of aliens within the City's borders."  *Id*. at 16-17.  This extraordinarily broad definition cannot possibly be squared with controlling Supreme Court precedent.  As Judge Elrod observed:  "[T]he majority broadly proclaims that 'state and local laws that attempt to affect aliens will, with limited exceptions, be preempted by the national interest.'  This broad statement is directly contrary to Supreme Court precedent."  *Villas II* at 43 (*citing De Canas*, 424 U.S. at 355, and *Whiting*, 131 S. Ct. at 1973).  Judge Elrod is exactly right, as explained below.

In *De Canas*, the Supreme Court specifically approved of state efforts to reduce the problems that may result from illegal immigration.  It held that the State of California was well within its authority to "protect California's fiscal interests and lawfully resident labor force from the deleterious effects on its economy resulting from the employment of illegal aliens."  *De Canas*, 424 U.S. at 357.  Such efforts did not fall within the narrow definition of a regulation of immigration:

> In this case, California has sought to strengthen its economy by adopting federal standards in imposing criminal sanctions against state employers who knowingly employ aliens who have no federal right to employment within the country; even if such local regulation has some purely speculative and indirect impact on immigration, *it does*

> *not thereby become a constitutionally proscribed regulation of immigration … .*

*Id.* at 355-56 (emphasis supplied). In 1982, the Supreme Court reiterated that a state or city is permitted to deter the influx of illegal aliens:

> [U]nchecked unlawful migration might impair the State's economy generally, or the State's ability to provide some important service. Despite the exclusive federal control of this Nation's borders, *we cannot conclude that the States are without any power to deter the influx of persons entering the United States against federal law*, and whose numbers might have a discernible impact on traditional state concerns.

*Plyler v. Doe*, 457 U.S. 202, 228 n.23 (1982) (emphasis supplied). These plain statements squarely conflict with the majority's attempt to redefine a preempted "regulation of immigration" as any law that addresses the presence of illegal aliens.

The majority's newly-invented definition also conflicts with the Supreme Court's holding in *Chamber of Commerce v. Whiting*, 131 S. Ct. 1968 (2011). There, the Court upheld the Legal Arizona Workers Act, which prohibits employers from knowingly employing unauthorized aliens. As the Supreme Court noted, Arizona's intention to stop the employment of unauthorized aliens was clear: "Of course Arizona hopes that its law will result in more effective enforcement of the prohibition on employing unauthorized aliens." 131 S. Ct. at 1984. If the majority's definition of a preempted regulation of immigration were correct, then the Arizona law certainly would have been preempted.

As Judge Elrod explained, there is no way to square the majority's newly-

concocted definition of "regulation of immigration" with *Whiting*:

> [T]he majority claims the Ordinance is a regulation of immigration because it may force illegal immigrants to relocate from Farmers Branch. This theory is inconsistent with Supreme Court precedent. Just last term, the Supreme Court upheld a state law revoking the licenses of employers that knowingly employ illegal immigrants, which effectively forces aliens to relocate by depriving them of employment.

*Villas II* at 41 (Elrod, J., dissenting). The Supreme Court has long equated the denial of employment with the denial of abode: "In ordinary cases [aliens] cannot live where they cannot work." *Truax v. Raich*, 239 U.S. 33, 42 (1915). If, as *Whiting* held, states and cities can restrict employment of illegal aliens without impermissibly regulating immigration, it follows inexorably that they can restrict the knowing harboring of such aliens in rental housing without doing so.

### C. The Majority Ignored the Conflict Preemption Test of *Whiting*.

The majority's confused conflict preemption analysis creates yet another inconsistency with Supreme Court precedent. The majority seems to hold that the Ordinance conflicts with federal law because "it seeks to use an alien's immigration status for a purpose different from that intended under the federal scheme." *Villas II* at 22. This unsupported assertion is contradicted by the Supreme Court's holding in *Whiting* (and also by the plain language of federal law).

The *Whiting* Court rejected a similar conflict-preemption challenge. Like the Ordinance, the Arizona law also used federal determinations of aliens' immi-

gration status for the purposes of enforcing its own law.  The *Whiting* Court held

that there was no conflict preemption because (1) the Arizona law used the termi-

nology of federal law precisely, and (2) the Arizona law relied upon federal deter-

minations of an alien's status:

> Arizona went the extra mile in ensuring that its law closely tracks IR-
> CA's provisions in all material respects.  The Arizona law begins by
> adopting the federal definition of who qualifies as an "unauthorized
> alien." … Not only that, the Arizona law expressly provides that state
> investigators must verify the work authorization of an allegedly unau-
> thorized alien with the Federal Government, and 'shall not attempt to
> independently make a final determination on whether an alien is au-
> thorized to work in the United States.' … The federal determination
> on which the State must rely is provided under 8 U.S.C. § 1373(c).

*Whiting*, 131 S. Ct. at 1981-82.  The same two factors are present here.  As the dis-

trict court correctly noted, Ordinance 2952 uses the precise terms and classifica-

tions of federal immigration law.  701 F. Supp. 2d at 841.  In addition, the Ordi-

nance contains language nearly identical to Arizona's, requiring local officials to

rely solely on federal determinations of immigration status under 8 U.S.C. §

1373(c).  *See* § 26-119(D)(3).

    Under *Whiting*, those factors dictate a holding of non-preemption.  But the

majority completely disregarded the conflict-preemption approach of *Whiting*:

> In suggesting a conflict, the majority glosses over the Ordinance's
> requirement that city officials must give absolute deference to the
> determinations of the federal government. … Ordinance 2952, §
> 1(D)(3).  Here Farmers Branch is powerless to make "any indepen-
> dent determination" of immigration status, which the Supreme Court
> called going "the extra mile" to avoid preemption.  *Whiting*, 131 S. Ct.

at 1981. … *In fact, the Ordinance mirrors the statutory language approved in* <u>*Whiting*</u>.

*Villas II* at <u>46</u> (Elrod, J., dissenting) (emphasis supplied).

Moreover, the majority made no attempt to explain how its reasoning could be squared with the plain language of 8 U.S.C. § 1373(c), the federal statute that facilitates Ordinance 2952 and similar state and local laws. That statute requires that the federal government "shall respond" to any local official's request for an alien's immigration status "*for any purpose* authorized by law" in that jurisdiction – not merely for a limited set of purposes specified in federal immigration law. 8 U.S.C. § 1373(c) (emphasis supplied). In attempting to limit the purposes of § 1373(c) inquiries, the majority ignored the plain meaning of this federal statute.

## II.   THE MAJORITY OPINION CONFLICTS WITH PRIOR DECISIONS OF THIS COURT.

### A.   The Majority Opinion Conflicts With *Doe v. Plyler*.

With respect to its regulation-of-immigration holding, the majority opinion stands in stark contrast to the decision of this Court in *Doe v. Plyler*. There, this Court held that a preemption challenge to a Texas law denying free K-12 education to illegal alien students was baseless:

> After reviewing the relevant federal policy, we conclude that the perceived conflicts are at most illusory and that [the state law] does not conflict with federal policy. … [T]he federal government also denies illegal aliens federal largess. … [A]nd we think it not inconsistent with that federal policy for Texas to likewise deny illegal aliens its largess.

-12-

*Doe v. Plyler*, 628 F.2d at 453.[4]  The majority opinion in the instant case did not

mention this Court's prior holding in *Doe v. Plyler*, much less follow its reasoning.

As Judge Elrod observed, *Doe v. Plyer* completely undercuts the majority's

novel definition of a preempted regulation of immigration:

> This circuit has also held that a Texas statute denying free public
> education to children because of their status as illegal immigrants was
> not preempted by federal law.  *See Doe v. Plyler*, 628 F.2d 448, 451-
> 54. … Certainly, just like prohibiting employment, the exclusion from
> free public education could effectively force illegal immigrants to
> relocate.  Yet neither of these examples constitutes a regulation of
> immigration under Supreme Court or Fifth Circuit precedent.  Rather
> than follow this binding precedent, however, the majority bases its
> analysis on a Third Circuit precedent that has been vacated by the
> Supreme Court.  *See City of Hazleton v. Lozano*, 131 S. Ct. 2958
> (2011).

*Villas II* at 42 (Elrod, J., dissenting).

### B.     The Majority Opinion Conflicts With This Court's Harboring Decisions.

It is well established that a state or local ordinance is not preempted if it

concurrently prohibits the same behavior that is also prohibited by federal law.

*Whiting*, 131 S. Ct. at 1982 ("From this basic starting point, the Arizona law con-

tinues to trace the federal law"); *Gonzales v. Peoria*, 722 F.2d 468, 474 (9th Cir.

1983) ("Where state enforcement activities do not impair federal regulatory inter-

---

[4]The *Doe v. Plyler* court went on to invalidate the challenged statute on equal protection grounds.  628 F.2d at 454-61.  The Supreme Court affirmed this holding without addressing the preemption issue.  *Plyler v. Doe*, 457 U.S. 202 (1982).

ests concurrent enforcement activity is authorized"); *see also Lynch v. Cannatella*, 810 F.2d 1363 (5th Cir. 1987).

Here, the Ordinance prohibits the same behavior that is prohibited by the federal harboring statute, 8 U.S.C. § 1324(a)(1)(A)(iii). This Court has long defined that statute broadly, to include knowingly providing an apartment or other lodging to an illegal alien. *United States v. Gomez-Moreno*, 479 F.3d 350, 352, 354 (5th Cir. 2007); *United States v. Varkonyi*, 645 F.2d 453, 459 (5th Cir. 1981). By failing to recognize that the Ordinance represents unpreempted concurrent enforcement in the Fifth Circuit, the majority disregarded and undermined this Court's well-established case law on this point:

> Local agencies may assist the enforcement of federal immigration law, *Lynch* at 1371, and this circuit construes the anti-harboring provisions broadly. *See United States v. Rubio-Gonzales*, 674 F.2d 1067 1073 n.5 (5th Cir. 1982). … The Ordinance makes it easier to prove the anti-harboring element of a defendant's knowledge of the alien's unlawful status, removing potential doubt when a landlord leases an apartment.

*Villas II* at 46-47 n.7 (Elrod, J., dissenting). Thus, the Ordinance not only mirrors federal law, but assists in the enforcement of federal law. The majority completely failed to address this line of Fifth Circuit precedents on the subject of harboring.

## III. THIS CASE INVOLVES QUESTIONS OF EXCEPTIONAL IMPORTANCE.

Finally, the subject of what a city or state may do to discourage illegal immigration presents questions of immense national importance. The breakdown of

-14-

the rule of law in immigration is one of the greatest legal challenges facing this country. An illegal immigration wave has swept the country since the mid-1980s, with approximately 11 million illegal aliens currently living in the United States.[5]

In recent years, many states and localities have adopted measures to mitigate the illegal immigration crisis within their respective jurisdictions,[6] thereby choosing to exercise their authority to deter illegal immigration by enacting "harmonious state regulation" that does not conflict with federal law. *See De Canas*, 424 U.S. at 358. The validity of these state and local measures is currently a matter of great legal interest, having garnered the attention of the Supreme Court in two successive terms. The core issue presented in this case – the extent to which a state or local government may, consistently with federal law, aid in its enforcement by restricting the knowing harboring of illegal aliens in rental accommodations within its boundaries – is an important question of federal immigration law and warrants *en banc* consideration by this Court.

## **CONCLUSION**

For all of the reasons discussed above, rehearing *en banc* should be granted.

---

[5]Michael Hoefer, *Population Estimates: Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2009* (January 2010) (available at www.dhs.gov/-xlibrary/assets/statistics/publications/ois_ill_pe_2009.pdf).

[6]The majority opinion catalogs some of these measures. *See Villas II* at 18-19.

Respectfully submitted,

s/ Kris W. Kobach                                    s/ P. Michael Jung
KRIS W. KOBACH                              P. MICHAEL JUNG
Kansas State Bar No. 17280                  Texas State Bar No. 11054600
                                            SCOTT A. SHANES
Kobach Law, LLC                             Texas State Bar No. 00784953
4701 N. 130th Street                        WM. C. (TREY) DOWDY, III
Kansas City, Kansas 66109                   Texas State Bar No. 06074500
(913) 638-5567

                                            Strasburger & Price, LLP
                                            901 Main Street, Suite 4400
                                            Dallas, Texas 75202
                                            (214) 651-4300
                                            (214) 651-4330 (telecopy)

ATTORNEYS FOR APPELLANT

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this Petition for Rehearing *En Banc* has been served on the appellees by transmission of copies thereof through the Court's electronic filing system to: James Stephen Renard, Esq. (jsr@bickelbrewer.com)\*, and C. Dunham Biles, Esq. (cdb@bickelbrewer.com)\*; and Nina Perales, Esq. (nperales@maldef.-org), Lisa Graybill, Esq. (lgraybill@aclutx.org)\*\*, Omar C. Jadwat, Esq. (ojad-wat@aclu.org)\*\*, and Jennifer C. Newell (jnewell@aclu.org)\*\*; all on this 25th day of April, 2012.

/s P. Michael Jung
P. MICHAEL JUNG

\*Attorney for Appellees Villas at Parkside Partners d/b/a Villas at Parkside, Lake-view at Parkside Partners, Ltd., d/b/a Lakeview at Parkside, Chateau Ritz Partners d/b/a Chateau de Ville, and Mary Miller Smith

\*\*Attorney for Appellees Valentin Reyes, Alicia Garcia, Ginger Edwards, Jose Guadalupe Arias, and Aide Garza

## <u>CERTIFICATE REGARDING ELECTRONIC SUBMISSION</u>

I hereby certify that: (1) required privacy redactions have been made; (2) the electronic submission of this document is an exact copy of the corresponding paper document; and (3) the document has been scanned for viruses with the most recent version of a commercial virus scanning program and is free of viruses.

/s P. Michael Jung
P. MICHAEL JUNG

Petition for Rehearing En Banc.DOC

## <u>CERTIFICATE OF COMPLIANCE</u>

1.    This brief contains 3,795 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2003 in Times New Roman 14 point type.

/s P. Michael Jung

P. MICHAEL JUNG
Attorney for Appellant

Dated:  April 25, 2012

# Appendix

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

March 21, 2012

Lyle W. Cayce
Clerk

No. 10-10751

VILLAS AT PARKSIDE PARTNERS, doing business as Villas at Parkside;
LAKEVIEW AT PARKSIDE PARTNERS, LIMITED, doing business as
Lakeview at Parkside; CHATEAU RITZ PARTNERS, doing business as
Chateau De Ville; MARY MILLER SMITH;

                                   Plaintiffs–Appellees

v.

THE CITY OF FARMERS BRANCH, TEXAS,

                                   Defendant-Appellant

-----------------------------------------------------------------------------------------

VALENTIN REYES; ALICIA GARCIA; GINGER EDWARDS; JOSE
GUADALUPE ARIAS; AIDE GARZA

                                   Plaintiffs–Appellees

v.

CITY OF FARMERS BRANCH

                                   Defendant-Appellant

Appeals from the United States District Court
for the Northern District of Texas

Before REAVLEY, ELROD, and GRAVES, Circuit Judges.

REAVLEY, Circuit Judge:

No. 10-10751

The City of Farmers Branch, Texas, ("the City") appeals the district court's summary judgment enjoining it from implementing a purported housing ordinance that requires all adults living in rental housing within the City to obtain an occupancy license conditioned upon the occupant's citizenship or lawful immigration status. The district court concluded that the ordinance was preempted by federal law as a regulation of immigration that infringed Congress's constitutional power. The court also concluded that the ordinance was field preempted and conflict preempted under federal law. We conclude that the ordinance's sole purpose is *not* to regulate housing but to exclude undocumented aliens, specifically Latinos, from the City of Farmers Branch and that it is an impermissible regulation of immigration. We hold that the ordinance is unconstitutional and presents an obstacle to federal authority on immigration and the conduct of foreign affairs. We therefore AFFIRM the district court's judgment.

## I. Background

The City adopted Ordinance 2952 ("the Ordinance") on January 22, 2008, requiring that every adult person wishing to rent or lease any single family residence or apartment within Farmers Branch must apply for a residential occupancy license from the City's Building Inspector.[1] Any proposed occupant who is not a United States citizen must provide an identification number establishing lawful presence in this country. If the non-citizen has no identification number, he may declare a lack of knowledge of such a number. The Building Inspector must verify with the federal government whether a non-citizen is "an alien lawfully present in the United States."

The Building Inspector will revoke the occupancy license of an alien who is unlawfully present in this country. If the federal government is unable to

---

[1] The text of the Ordinance is set out in full in the appendix to this opinion.

No. 10-10751

verify the occupant's lawful status as requested, the Building inspector may take the word of the alien, but the Ordinance makes it a criminal offense to make a false declaration on the occupancy license application. It is also a criminal offense for a person to occupy rental housing without a valid occupancy license or for a lessor to knowingly permit a person to occupy a rental unit without a valid license. The penalty for each offense is a fine of $500 per day of the occupancy.

The history of Ordinance 2952 began several years prior to its enactment when the City Council for Farmers Branch began considering a need to address perceived harms posed by illegal aliens, particularly Latinos, residing in the City. In 2006, the City Council passed a resolution expressing frustration over the federal government's purported failure to enforce immigration laws and to prevent the "influx of illegal aliens . . . estimated in the millions" that were "coming in across our most southerly border." The resolution declared the City's intent to "take whatever steps it legally can to respond to the legitimate concerns of our citizens." The City also adopted a resolution declaring English as the official language of Farmers Branch. The City subsequently passed Ordinance 2892, the first of three attempts to regulate immigration in the rental housing context. That ordinance directed owners and property managers to require submission of evidence of citizenship or immigration status for each tenant family. Around the time of that ordinance's adoption, the City also created a task force to assess redevelopment opportunities in the City, which issued several reports identifying the City's "lower income, minority population" and its increasing Hispanic and ethnic population as concerns and obstacles for

No. 10-10751

redevelopment.[2]  Ordinance 2892 was later repealed in 2007 after a state court enjoined it due to possible violations of the Texas Open Meetings Act.

The City Council subsequently adopted substantially similar provisions by passing Ordinance 2903, however, which additionally provided for a referendum on the measure.  Voters in the City approved Ordinance 2903, but in May 2008 a federal district court enjoined its enforcement, holding that the ordinance violated due process, was void for vagueness, and was an impermissible regulation of immigration under the Supremacy Clause.[3]

The City tried again to affect immigration through its housing regulations with the adoption of Ordinance 2952.  The preamble to the Ordinance expresses a specific intent "to enact regulations that are harmonious with federal immigration law and which aid in its enforcement."  Testimony of City officials during the proceedings in this case confirmed what was obvious from the text of the ordinance—that the City's intent with each of the regulations noted above was to enact an exclusionary rule for illegal aliens in Farmers Branch.  For example, Tim O'Hare, who was a member of the City Council until he was elected mayor in 2007, testified that the 2006 English language resolution was intended to increase assimilation of non-English speakers and to make the City

---

[2] For example, a December report from the task force listed "demographics" among the barriers to redevelopment, noting that "[t]he population of Farmers Branch is getting older and more diverse . . . ."  Explaining this remark, the task force stated that "[t]he City's Hispanic population increased from about 5 percent to 37 percent between 1970 and 2000 and continues to grow at a rate exceeding all other ethnic and racial populations in the City."  The task force believed that "factors that impact the sustainability of the development" of a major retail area in the City included the fact that retailers were "responding to demographic change by increasingly marketing to growing ethnic populations, which in turn is giving rise to shopping centers devoted exclusively to ethnic populations, especially Hispanic, African American, and Asian populations."

[3] See Villas at Parkside Partners v. Farmers Branch, 577 F. Supp. 2d 858, 866–77, 879 (N.D. Tex. 2008) (Farmers Branch I).

No. 10-10751

less attractive to undocumented immigrants.[4] He stated that the resolution and the ordinance that followed were meant to "help reduce the illegal immigrant population in Farmers Branch." Indeed, O'Hare testified that the purpose of all three ordinances—2892, 2903, and 2952—was to "mak[e] it difficult for illegal aliens to rent property in the City of Farmers Branch . . . ." He also testified about his frustration with the federal government's failure to enforce immigration laws, and he confirmed that Ordinance 2952 was intended to compensate for that perceived failure. O'Hare's testimony was consistent with that of City Attorney Tim Scott, who also testified that the goal of the Ordinance was to address illegal immigration issues and to "reduce the number of illegal immigrants in Farmers Branch."

As justification for the above intent, the Ordinance expresses that it is authorized pursuant to the City's "police power to protect the health, safety, and welfare of its citizens." It further states that the Ordinance does not entail an intent to "alter supplant, disrupt, or interfere with federal immigration law."

Two groups of plaintiffs representing lessors and lessees of rental property in Farmers Branch brought a pre-enforcement action against the City raising a facial challenge to the Ordinance. In ruling on cross-motions for summary judgment, the district court permanently enjoined enforcement of the Ordinance on three grounds.[5] The district court concluded that the Ordinance was a local "regulation of immigration" entrusted by the Constitution to Congress and was therefore preempted under the Supremacy Clause.[6] Although some local

[4] O'Hare testified that the resolution was "one of several things that sent a message to people who aren't in the country legally, Farmers Branch is not the place for you."

[5] See *Villas at Parkside Partners v. City of Farmers Branch*, 701 F. Supp. 2d 835 (N.D. Tex. 2010) ("*Farmers Branch II*"). The district court first determined that the plaintiffs had standing to challenge the Ordinance. *Id.* at 845–51. The City has not appealed the district court's ruling on standing.

[6] *Id.* at 855.

5

No. 10-10751

regulation which merely touches on aliens may be permissible,[7] the district court here reasoned that "the Ordinance, though grounded in federal immigration classifications, is an invalid regulation of immigration because it uses those classifications for purposes not authorized or contemplated by federal law."[8]

The district court further determined that the Ordinance was impliedly preempted by the Immigration and Nationality Act ("INA")[9] under theories of both field preemption and conflict preemption.[10] The court reasoned that the INA is a "comprehensive regime for adjudicating an individual's right to remain in the country;" therefore, the Ordinance, "in addition to constituting a prohibited regulation of immigration [was field] preempted by the INA, which provides the exclusive means for removing aliens or adjudicating their status for that purpose."[11] With respect to conflict preemption, the district court noted that "[a] local regulation may not—though it may share a common goal with federal law—interfere with Congress's chosen methods."[12] Therefore, even though the Ordinance did not "purport to remove aliens from the United States," it was conflict preempted because it "regulates local residence based on federal classifications in a manner that directly affects the uniform enforcement of immigration laws."[13] The district court held that the City was impermissibly attempting to enforce its own immigration scheme.[14] The City now appeals.

---

[7] *See DeCanas v. Bica*, 424 U.S. 351, 355, 96 S. Ct. 933, 936 (1976).

[8] *Farmers Branch II*, 701 F. Supp. 2d at 855.

[9] 8 U.S.C. § 1101 *et seq.*

[10] *Farmers Branch II*, 701 F. Supp. 2d at 857–58.

[11] *Id.*

[12] *Id.* at 857.

[13] *Id.* at 857–58.

[14] *Id.* at 859.

No. 10-10751

## II. Discussion

We review a grant of summary judgment on preemption grounds de novo, applying the same standards as the district court.[15]  "Summary judgment is proper if the evidence shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[16]

The City contends on appeal that the district court erred by declining to afford the Ordinance a presumption against preemption, by finding that the Ordinance is a regulation of immigration, and by finding that the Ordinance is field and conflict preempted.  It contends that the Ordinance is merely an exercise of its police power to enact a housing regulation and that the Ordinance only tangentially touches upon aliens and immigration.  We conclude, however, that the Ordinance is designed to burden aliens, both documented and undocumented, in Farmers Branch.  As such, the Ordinance serves no legitimate City interest and is not a mere housing regulation entitled to a presumption against preemption; instead, it burdens the field of immigration.

## A. Effect of Ordinance 2952 and the presumption against preemption

In the field of immigration, the power to regulate "is unquestionably exclusively a federal power."[17]  The exclusivity of Congress's power stems from multiple constitutional sources, "including the Federal Government's power '[t]o establish [a] uniform Rule of Naturalization,' . . . its power '[t]o regulate Commerce with foreign Nations,' . . . and its broad authority over foreign affairs."[18]  It is clear from these sources of the federal power that immigration

---

[15] *O'Hara v. Gen. Motors Corp.*, 508 F.3d 753, 757 (5th Cir. 2007).

[16] *Griffin v. United Parcel Serv., Inc.*, 661 F.3d 216, 221 (5th Cir. 2011) (citation omitted); *see* FED. R. CIV. P. 56(a).

[17] *DeCanas*, 424 U.S. at 354, 96 S. Ct. at 936.

[18] *Toll v. Moreno*, 458 U.S. 1, 10 (1982) (alterations in original) (citations omitted).

No. 10-10751

is inextricably tied to national interests in many areas, one of the most significant of which is foreign relations. Indeed, the Supreme Court has recognized that immigration and the governing national policy thereof are inherently part of foreign affairs: "[T]he supremacy of the national power in the general field of foreign affairs, *including power over immigration, naturalization and deportation*, is made clear by the Constitution."[19] Given the breadth of the Constitution's understanding of immigration as a domain of the federal government, state and local laws that attempt to affect aliens will, with limited exceptions, be preempted by the national interest. We therefore begin by considering the preemption doctrine.[20]

"By virtue of the Supremacy Clause, it is a 'fundamental principle of the Constitution . . . that Congress has the power to preempt state law.'"[21] Federal law will preempt a state or local regulation "when (1) Congress expressly preempts state law; (2) Congressional intent to preempt may be inferred from the existence of a pervasive federal regulatory scheme; or (3) state law conflicts with federal law or its purposes."[22] A pervasive federal regulatory scheme may

---

[19] *Hines v. Davidowitz*, 312 U.S. 52, 62, 61 S. Ct. 399, 402–03 (1941) (emphasis added).

[20] As an initial matter, the City argues that the district court misapplied the standard for evaluating facial challenges to statutes because the court here did not consider whether there were any circumstances under which application of the Ordinance would be constitutional. *See United States v. Salerno*, 481 U.S. 739, 745, 107 S. Ct. 2095, 2100 (1987) (stating that a facial challenge "must establish that no set of circumstances exists under which the [challenged] Act would be valid"). The City's reliance on *Salerno* in support of its argument is unconvincing. If the Ordinance here goes beyond the City's constitutional authority to act, or if it conflicts with Congressional intent, it is irrelevant whether some of its provisions might be constitutionally applied. We therefore proceed to consider whether the Ordinance is a permissible exercise of the City's regulatory authority.

[21] *Planned Parenthood of Houston & Se. Tex. v. Sanchez*, 403 F.3d 324, 336 (5th Cir. 2005) (quoting *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372, 120 S. Ct. 2288, 2293 (2000)).

[22] *Frank v. Delta Airlines Inc.*, 314 F.3d 195, 197 (5th Cir. 2002) (citing *English v. Gen. Elec. Co.*, 496 U.S. 72, 78–79, 110 S. Ct. 2270, 2275 (1990)).

No. 10-10751

show that Congress intended to preempt the field, leaving no room for the states to supplement it.[23]  Even if Congress has not occupied the field, however, a state law will be preempted "where it is impossible for a private party to comply with both state and federal law," or where the state law presents an "obstacle" to the accomplishment of the purposes of the federal law.[24]

A state law will be presumed to be valid "[i]n all pre-emption cases, and particularly in those in which Congress has legislated . . . in a field which the States have traditionally occupied."[25]  This presumption serves purposes of federalism because where Congress acts in a field traditionally occupied by the states, "we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress."[26]  Nevertheless, this presumption against federal preemption "is not triggered when the State regulates in an area where there has been a history of significant federal presence."[27]  A threshold question then is whether the Ordinance here stands in an area of traditional state regulation, entitled to a presumption of validity, or instead receives no benefit from the presumption because it attempts to legislate in an area of significant federal concern.

As noted above, Congress has plenary power to regulate immigration.[28]  Thus, Congress and the federal government historically have had a presence in

---

[23] *English*, 496 U.S. at 79, 110 S. Ct. at 2275.

[24] *Crosby*, 530 U.S. at 372–73, 120 S. Ct. at 2294.

[25] *Wyeth v. Levine*, 555 U.S. 555, 565, 129 S. Ct. 1187, 1194 (2009) (internal quotation marks and citation omitted).

[26] *Rice v. Sante Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S. Ct. 1146, 1152 (1947).

[27] *United States v. Locke*, 529 U.S. 89, 90, 120 S. Ct. 1135, 1139 (2000).

[28] *DeCanas*, 424 U.S. at 354, 96 S. Ct. at 936.

No. 10-10751

the immigration field. However, the fact that aliens are the subject of a local regulation, standing alone, does not mean that the statute is a regulation of immigration that is preempted by federal law.[29]

For example, in *DeCanas*, the State of California prohibited the employment of unlawful aliens in the state, and the Court held that this was a permissible attempt to "strengthen [California's] economy by adopting federal standards in imposing criminal sanctions against state employers who knowingly employ aliens who have no federal right to employment within the country."[30] Thus, the Court viewed the state statute as an employment regulation, an area in which states have traditionally regulated, not a regulation of immigration. The Court further reasoned that the state statute was not field or conflict preempted because states retain "broad authority under their police powers to regulate the employment relationship to protect workers within the State," and there was no indication that Congress intended to preclude states from regulating the employment of aliens.[31] Instead, at the time of the state regulation Congress had expressed "at best" only a "peripheral concern with [the] employment of illegal entrants."[32] Rather than conflict with a Congressional act, the state law was consistent with a Congressional intent to allow states to regulate the employment of illegal aliens.[33]

---

[29] *Id.* at 355, 96 S. Ct. at 936; *see also Plyler v. Doe*, 457 U.S. 202, 225, 102 S. Ct. 2382, 2399 (1982) ("[T]he States do have some authority to act with respect to illegal aliens, at least where such action mirrors federal objectives and furthers a legitimate state goal.").

[30] *DeCanas*, 424 U.S. at 355, 96 S. Ct. at 936.

[31] *Id.* at 356 & 358, 96 S. Ct. at 937–38.

[32] *Id.* at 361, 96 S. Ct. at 939.

[33] *Id.*; Congress later overruled this part of *DeCanas*'s holding when it passed the Immigration Reform and Control Act of 1986, Pub. L. 99-603, 100 Stat. 3359, which expressly preempted "state laws imposing civil fines for the employment of unauthorized workers like the one [*DeCanas*] upheld." *Chamber of Commerce v. Whiting*, 131 S. Ct. 1968, 1975 (2011).

No. 10-10751

In the instant case, the City asserts that a presumption against preemption of the Ordinance applies because the Ordinance is a regulation of residential housing and the issuance of licenses to occupy rental units, which it argues is an area historically occupied by the states. According to the City, the Ordinance merely applies federal classifications consistent with federal law to achieve a purely local result. We disagree.

The text of the Ordinance, and the circumstances surrounding its adoption, show that its purpose and effect are to regulate immigration, an area of federal concern, rather than to regulate housing. The preamble to the Ordinance specifically states that the Ordinance is intended to aid the enforcement of "federal *immigration* law," not housing law. (Emphasis added). In fact, the Ordinance refers to federal immigration law either directly or by implication in seven of its eleven introductory "whereas" clauses. Moreover, the Ordinance ranges beyond landlord-tenant law because it conditions the validity of an occupancy license on the lawfulness of an occupant's immigration status, thereby expressly tying the Ordinance's criminal offenses to immigration rather than to some violation of the housing code. These facts belie the City's argument that the Ordinance is nothing more than a housing regulation.

On the contrary, the Ordinance has virtually nothing to say about the housing rental market, except for boilerplate language referencing the City's police power to protect its citizens. The regulatory scheme created by the Ordinance has none of the indicia one would expect of a housing regulation. For example, the Ordinance says nothing about the location, design, construction, maintenance, ownership, or alteration of residential rental units. It also provides no regulation for the number of residents or the permitted uses of rental housing. The Ordinance creates an application process for an occupancy license, but the applicant is not required to submit information about his employment or credit history, his past residence information, or his criminal

11

No. 10-10751

history. All that is required, besides standard information such as one's name and address, is one's citizenship information. Moreover, the only reason an occupancy license may be revoked is based on immigration status. On its face then the Ordinance hardly evinces a purpose to regulate rental housing in the City and instead points toward the real target of the regulation—the ferreting out and exclusion of undesirable illegal immigrants.

This purpose of the statute is confirmed by the evidence in the record. Despite an assertion in the preamble that the Ordinance was intended to promote the public health, safety, and general welfare, the City points to nothing showing an effect on public welfare by illegal aliens' occupancy of rental housing. The mayor of Farmers Branch confirmed that the City conducted no studies on the effects of undocumented aliens on the value of property in Farmers Branch, the quality of its schools, the crime rate, or the availability of healthcare to its residents. One City Council member, Gary Greer, testified that there was no data showing whether undocumented immigrants commit more crimes than others in Farmers Branch. Still another council member, David Koch, agreed that the Ordinance was "not directed in any way towards revitalization" but rather was "directed solely towards removing illegal immigrants."

The removal of illegal immigrants is thus the precise and intended effect of the Ordinance. Although the Ordinance provides no express removal mechanism, removal is the practical result of the Ordinance because it regulates who may be an occupant based solely on immigration status. This functional denial to aliens of access to rental housing based on their immigration status is "tantamount to the assertion of the right to deny them entrance and abode," an area that is historically one of federal, not state, concern.[34]

---

[34] *Truax v. Raich*, 239 U.S. 33, 42, 10 S. Ct. 7, 11 (1915).

12

No. 10-10751

The Third Circuit reached the same conclusion in a case addressing a similar municipal ordinance that required prospective occupants of rental housing to obtain an occupancy license and provide proof of legal citizenship or residency.[35] As the Third Circuit noted, we cannot ignore "the reality" that the Ordinance seeks to affect directly the presence of aliens in Farmers Branch and to condition that presence upon the lawfulness or unlawfulness of their immigration status.[36] The reality is that all aliens who are deemed unlawfully present because of an absence of documentation are effectively excluded from Farmers Branch. But because the prerogative of deciding which aliens may live in the United States belongs to the federal government, the City's Ordinance does not regulate in an area historically occupied by the states, and the district court correctly declined to afford it a presumption of validity.

## B. Regulation of immigration and preemption

The conclusion that the Ordinance is not a local housing regulation, and instead determines which aliens may reside in Farmers Branch, necessarily compels our conclusion about preemption of the Ordinance as a regulation of immigration contrary to federal authority. Because we conclude that the sole purpose of the Ordinance is to target illegal aliens and effect their removal from

---

[35] *Lozano v. City of Hazelton*, 620 F.3d 170, 220 (3d Cir. 2010), *vacated by* 131 S. Ct. 2958 (2011). The Third Circuit's decision in *Lozano* addressed local regulations concerning aliens and immigration in both the housing and employment contexts. The Supreme Court recently vacated the Third Circuit's judgment for further consideration in light of *Chamber of Commerce v. Whiting*, 131 S. Ct. 1968 (2011). *See City of Hazelton v. Lozano,* 131 S. Ct. 2958 (2011). In *Whiting*, the Court upheld a local regulation concerning the employment of illegal aliens, but it was not faced with regulations affecting immigration in the housing context. Therefore, although we acknowledge that the entirety of the Third Circuit's judgment has been vacated, we nevertheless find *Lozano*'s reasoning instructive in this case because the Third Circuit was faced with a housing regulation squarely analogous to the one in the instant case, and the Supreme Court's decision in *Whiting* does not affect that reasoning.

[36] *Lozano*, 620 F.3d at 220.

No. 10-10751

the City, we also conclude that the Ordinance is an impermissible regulation of immigration posing an obstacle to federal control of immigration policy.

As noted above, the national government is entrusted with significant constitutional power to regulate immigration flowing from, *inter alia*, its power over foreign affairs. In light of this close relationship between immigration and foreign relations, then, it is necessary that the federal government, rather than individual states, have "broad" power over the presence of aliens, including the power to "determin[e] what aliens shall be admitted to the United States, the period they may remain, regulation of their conduct before naturalization, and the terms and conditions of their naturalization." *Takahashi v. Fish & Game Comm'n.*[37] Indeed, Congress has exercised its exclusive power by enacting the Immigration and Nationality Act ("INA"),[38] which "established a 'comprehensive federal statutory scheme for regulation of immigration and naturalization' and set 'the terms and conditions of admission to the country and the subsequent treatment of aliens lawfully in the country.'"[39]

State or local legislation that interferes with or burdens the broad federal power is impermissible, even if local and federal laws share a common goal.[40] For example, in *Hines* the Supreme Court addressed the validity of a state alien-registration law in light of a subsequently enacted federal law that required

---

[37] 334 U.S. 410, 419, 68 S. Ct. 1138, 1142 (1948) (citation omitted); *see also Mathews v. Diaz*, 426 U.S. 67, 84, 96 S. Ct. 1883, 1893–94 (1976) ("[I]t is the business of the political branches of the Federal Government, rather than that of either the States or the Federal Judiciary, to regulate the conditions of entry and residence of aliens.").

[38] *See* 8 U.S.C. § 1101 *et seq.*

[39] *Whiting*, 131 S. Ct. at 1973 (quoting *DeCanas*, 424 U.S. at 353 & 359, 96 S. Ct. at 935 & 938).

[40] *See Takahashi*, 334 U.S. at 419, 68 S. Ct. at 1142 ("State laws which impose discriminatory burdens upon the entrance or residence of aliens lawfully within the United States conflict with this constitutionally derived federal power to regulate immigration, and have accordingly been held invalid.") (footnote omitted).

No. 10-10751

similar registration.[41]  The subject matter of the state and federal laws was essentially identical, but the Court concluded that the state did not possess equal and concurrent power over alien registration.[42]  Of particular "importance" was the fact that the state law was "in a field which affects international relations, the one aspect of our government that from the first has been most generally conceded imperatively to demand broad national authority."[43]  Because of this imperative for a uniform national expression of policy, the Court concluded that the state could not enact its own laws that *inter alia* "complement[] the federal law, or enforce additional or auxiliary regulations."[44] The Court so concluded, even though compliance with both the federal and state laws was possible, because the state act was "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."[45]

In the instant case, we think that the Ordinance similarly infringes Congress's exclusive authority over the regulation of immigration and treads on foreign relations in a way contrary to the requirement of a national voice on immigration policy.  The City argues that the Ordinance does not regulate

---

[41] *Hines*, 312 U.S. at 56, 61 S. Ct. at 400.

[42] *Id.* at 68, 61 S. Ct. at 405.  Although the Court did not address whether the state law was impermissible because federal power, whether exercised or unexercised, is exclusive, *see id.* at 401, 61 S. Ct. at 62, we find the Court's discussion of state-federal interaction to be particularly instructive to the instant case.  As noted above, the exclusivity of Congress's power to regulate immigration is well established.  *See DeCanas*, 424 U.S. at 354, 96 S. Ct. at 936; *Truax*, 239 U.S. at 42, 36 S. Ct. at 11 ("The authority to control immigration—to admit or exclude aliens—is vested solely in the Federal Government.") (citation omitted).

[43] *Hines*, 312 U.S. at 68, 61 S. Ct. at 404; *see also Crosby*, 530 U.S. at 381, 120 S. Ct. at 2298 (holding preempted a state law restricting authority of state agencies to purchase goods and services from companies doing business with Burma, even though it shared the same goal as a similar federal law, because *inter alia* the state law "compromise[d] the very capacity of the President to speak for the Nation with one voice in dealing with other governments").

[44] *Hines*, 312 U.S. at 66–67, 61 S. Ct. at 404.

[45] *Id.* at 67, 61 S. Ct. at 404.

15

No. 10-10751

immigration because it does not make a determination about admittance into the United States or the conditions under which a lawful entrant may remain in this country. The City contends that the Ordinance instead merely defers to federal categories of immigration status and to federal determinations of any particular alien's status. We are unconvinced.

The Supreme Court stated in *DeCanas* that a "regulation of immigration . . . is *essentially* a determination of who should or should not be admitted into the country, and the conditions under which a legal entrant may remain."[46] We recognize that the Ordinance here does not literally control the entry and exit of aliens into and out of Farmers Branch or the United States. However, we do not read the quoted language from *DeCanas* in the same literal and hyper-technical manner as does the City because we do not read *DeCanas* as attempting to define an impermissible regulation of immigration. In context, the quoted language merely recognized as impermissible a category of state and local regulation that would be unconstitutional even with explicit Congressional authorization. But as the Court later explained, *DeCanas* "rejected the pre-emption claim not because of an absence of congressional intent to pre-empt, but because Congress *intended* that the States be allowed, 'to the extent consistent with federal law, [to] regulate the employment of illegal aliens.'"[47] The Court found specific Congressional authorization for the local law in *DeCanas*, in an area—employment—that also had historic state regulation, and so there was no need to define the outer bounds of what it means to be a regulation of immigration. In this case, however, we believe that the Ordinance

---

[46] *DeCanas*, 424 U.S. at 355, 96 S. Ct. at 936 (emphasis added).

[47] *Toll*, 458 U.S. at 13 n.18, 102 S. Ct. at 2984 n.18 (emphasis in original) (quoting *DeCanas*, 424 U.S. at 361, 96 S. Ct. at 939). In *DeCanas*, the Court found evidence that Congress intended to permit states to regulate the employment of illegal aliens by looking to amendments made in 1974 to the Farm Labor Contractor Registration Act. *See DeCanas*, 424 U.S. at 361, 96 S. Ct. at 939 (citing 88 Stat. 1652, 7 U.S.C. § 2041 *et seq.*).

No. 10-10751

does in fact regulate immigration because it seeks to address directly the presence of aliens within the City's borders. We agree with the Third Circuit's view that "[i]t is difficult to conceive of a more effective method of ensuring that persons do not enter or remain in a locality than by precluding their ability to live in it."[48]

By denying aliens access to rental housing, the Ordinance here effectively forces them to relocate. As noted above, the preamble to the Ordinance expressly states that it is designed to enforce immigration law, and numerous City officials explicitly stated that the ordinance was intended to reduce the number of illegal aliens in Farmers Branch. The undeniable practical effect of the Ordinance is thus to compel the departure of aliens from the City to other cities, states, or foreign countries, thereby setting the City's own policy on immigration and regulating immigration across and outside the City's borders.[49]

Moreover, as the district court held, the Ordinance imposes additional burdens on aliens that were not contemplated by Congress.[50] For example, the Ordinance requires illegal aliens to declare themselves to the City Building Inspector, denies them the ability to enter private contracts for shelter, and subjects them to criminal sanctions, all in an effort to exclude them from the

---

[48] *Lozano*, 620 F.3d at 220–21 (internal quotation marks and citation omitted). We also think that access to housing, or the lack thereof, is also a more direct regulation of an alien's presence in a location than the denial of employment, which further distinguishes this case from *DeCanas*. *Cf. Truax*, 239 U.S. at 42, 10 S. Ct. at 11.

[49] *See United States v. Arizona*, 641 F.3d 339, 367 (9th Cir. 2011) (Noonan, J., concurring) (finding that where state legislature declared that the presence of illegal aliens was to be discouraged and their number diminished by Arizona statute requiring law enforcement officers to check a person's immigration status, "[w]ithout qualification, Arizona establishes its policy on immigration"), *cert. granted by* 132 S. Ct. 845 (2011) (No. 10A1277, 11-182); *cf. Healy v. Beer Inst., Inc.*, 491 U.S. 324, 332, 109 S. Ct. 2491, 2497 (1989) ("[A] state law that has the 'practical effect' of regulating commerce occurring wholly outside that State's borders is invalid under the Commerce Clause.").

[50] *See Farmers Branch II*, 701 F. Supp. 2d at 855.

No. 10-10751

City. Because states lack the constitutional power of the federal government when it comes to immigration, however, the Ordinance may "neither add to nor take from the conditions lawfully imposed by Congress upon admission, naturalization and residence of aliens in the United States or the several states."[51]

Because the Ordinance has no other purpose than to exclude undocumented aliens who are in the city seeking residence, it adds to the serious national federal problem with immigration and the relations of this country with other countries, especially Mexico. Growing evidence of this national problem can be seen in federal court litigation, as numerous state and local governments seek to target problems, real or imagined, with illegal immigrants. As already noted, a Pennsylvania municipality passed an ordinance virtually identical to Farmers Branch's ordinance seeking to condition residence in rental housing on an occupant's lawful immigrations status.[52] Arizona, reacting to "a serious problem of unauthorized immigration along the Arizona-Mexico border," enacted legislation creating its own immigration policies and seeking to deter unlawful entry by requiring its police officers to enforce those policies.[53] And the state legislature in Alabama has also sought to discourage illegal immigration

---

[51] *Takahashi*, 334 U.S. at 419, 68 S. Ct. at 1142; *see also Lozano*, 620 F.3d at 220 ("The comprehensiveness of the INA scheme for regulation of immigration and naturalization . . . plainly precludes state efforts, whether harmonious or conflicting, to regulate residence in this country based on immigration status.") (internal quotation marks and citation omitted).

[52] *See Lozano*, 620 F.3d at 180.

[53] *See Arizona*, 641 F.3d at 343. The Arizona law requires police to investigate a person's immigration status when stopped or arrested if the person is suspected of being in the state without authorization, *see id.* at 346; creates offenses for an alien to fail to carry registration documents, *id.* at 354–55, or to work in the state without authorization, *id.* at 357; and allows police to arrest a person without a warrant if police have probable cause to believe the person is removable from the United States, *id.* at 360. As noted above, the Supreme Court recently granted certiorari in the Arizona case and will decide whether Arizona's statute is preempted by federal immigration law. *See Arizona v. United States*, 132 S. Ct. 845 (2011) (No. 10A1277, 11-182).

No. 10-10751

by enacting a law creating numerous criminal offenses predicated on immigration status.[54] This increasing treatment—some might say mistreatment—of illegal immigrants around the country only reinforces what the Supreme Court has said in explaining why a national policy on immigration unimpeded by the whims of the various states is paramount.

As the Court has put it, "[i]f th[e] government [of California] should get into a difficulty [because of its treatment of noncitizens] which would lead to war, or to suspension of intercourse, would California alone suffer, or all the Union?"[55] Clearly then, the treatment of aliens entails issues of national concern that reach beyond parochial concerns of individual states and includes matters such as trade, treaty obligations, and reciprocal rights agreements. It is imperative that the nation act singularly in conducting matters of foreign relations, particularly the treatment of noncitizens, because the burdening of another country's citizens will undoubtedly affect how this nation's citizens are in turn treated abroad. The Supreme Court has said that

> [o]ne of the most important and delicate of all international relationships, recognized immemorially as a responsibility of government, has to do with the protection of the just rights of a country's own nationals when those nationals are in another country. Experience has shown that international controversies of the gravest moment, sometimes even leading to war, may arise from

---

[54] *See United States v. Alabama*, 813 F. Supp. 2d 1282 (N.D. Ala. 2011). The Alabama law, *inter alia*, makes it a misdemeanor to willfully fail to carry an alien registration document; makes it unlawful for an unauthorized alien to apply for, solicit, or perform work; requires law enforcement officers to determine citizenship for persons stopped, detained, or arrested when the person is suspected to be unlawfully present in the United States; makes it unlawful to conceal, harbor, or shield an unlawful alien or to encourage an unlawful alien to come to the United States; forbids employers from claiming as business tax deductions wages paid to unauthorized aliens; and makes it a felony for an unlawful alien to enter into a business transaction with the state or any of the state's political subdivisions. *Id.* at 1292–93.

[55] *Chy Lung v. Freeman*, 92 U.S. 275, 279 (1875).

No. 10-10751

real or imagined wrongs to another's subjects inflicted, or permitted, by a government.[56]

It is clear to us that the City of Farmers Branch, by enacting the Ordinance, threatens the careful balance that the federal government must maintain in foreign affairs and impedes the federal prerogative for deciding how to treat illegal immigrants, which it achieves through the scheme of the INA. Although the City argues that the Ordinance is consistent with the INA and that Congress explicitly contemplated state regulations addressing the presence of illegal aliens, we are unpersuaded. The INA provisions cited by the City may contemplate cooperation among the federal, state, and local governments in the enforcement of the federal immigration scheme and the arrest of illegal immigrants,[57] but we do not read the INA to contemplate a locality enacting its

---

[56] *Hines*, 312 U.S. at 65, 61 S. Ct. at 403 (footnote omitted); *see also Chy Lung*, 92 U.S. at 279 ("[W]e venture the assertion, that, if citizens of our own government were treated by any foreign nation as subjects of the Emperor of China have been actually treated under this law, no administration could withstand the call for a demand on such government for redress."). How non-citizens within our borders are treated and the consequences for our international obligations and the treatment of our own citizens abroad are just as much a national concern today as in the days of *Hines* and *Chy Lung*. Only this year, Secretary of State Hillary Clinton reaffirmed this point in a written statement to Congress, where she stated that "[t]he State Department has no greater responsibility than the protection of U.S. citizens overseas" and that "[t]o protect our citizens, we need to do our part to protect those of other countries." *Fulfilling Our Treaty Obligations and Protecting Americans Abroad: Hearing on S. 1194 Before the Senate Committee on the Judiciary*, 112th Cong. 12-13 (2011) (appendix to testimony of Patrick F. Kennedy, Under Secretary of State); *digested at* 157 C O N G .   R E C .   D   8 5 3 ,   *a v a i l a b l e   a t* http://www.judiciary.senate.gov/hearings/testimony.cfm?id=3d9031b47812de2592c3baeba6 2c686d&witid=3d9031b47812de2592c3baeba62c686d-1-1.

[57] *See, e.g.*, 8 U.S.C. § 1324(c) (contemplating that "officers whose duty it is to enforce criminal laws," including state officers, may arrest persons who violate the INA's anti-harboring provisions); § 1357(g)(10) (contemplating cooperation between state officers and the federal government "in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States"); § 1373(c) (requiring Immigration and Naturalization Service to "respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law"); § 1621 (making unlawful aliens ineligible for certain defined state benefits and public assistance); § 1644 (requiring that state

No. 10-10751

own scheme of immigration enforcement or its own ordinances to deal with illegal aliens in whatever manner the locality deems fit.[58]

The INA provides a comprehensive scheme, with ample provision for the exercise of discretion, for the *federal government* to determine how best to address or to not address illegal aliens. Whereas the Ordinance precludes an alien's presence in rental housing—and by extension within the City—based solely on the unlawfulness of the alien's immigration status, a similar unlawfulness determination in the federal scheme would merely subject an alien to the *process* of the INA, under which removal of an alien may not result until after a hearing and an opportunity for the alien to be heard.[59] The federal government has determined that such process is the exclusive means for adjudicating whether a particular alien will be removed.[60] It is no response to say, as the City does, that the Ordinance defers to the federal classification of an alien's immigration status because, although the Ordinance uses some of the

——————————

and local governments must be permitted to "send[] to or receiv[e] from the Immigration and Naturalization Service information regarding the immigration status, lawful or unlawful, of an alien in the United States").

[58] It is true that in *Plyler*, which addressed an equal protection challenge to a state's denial of public education to the children of undocumented aliens, the Supreme Court said that states are not "without any power to deter the influx of persons entering the United States against federal law, and whose numbers might have a discernible impact on traditional state concerns." *Plyler*, 457 U.S. at 228 n.23, 102 S. Ct. at 2400 n.23. The Court supported its statement by citing *DeCanas*, which we have already noted involved the regulation of employment, an area of frequent state concern and regulation. *See DeCanas*, 424 U.S. at 356–57, 96 S. Ct. at 937 (noting states' "broad" authority over employment relationships and the local problems addressed by the state regulation). The *Plyler* Court thus recognized state authority to regulate aliens in areas of traditional state interest; it did not find permissible state regulations that directly affect the entry or removal of illegal aliens, which is what the Ordinance in this case does.

[59] *See* 8 U.S.C. §§ 1229 and 1229a (outlining procedures for removal proceedings).

[60] *See* § 1229a(a)(3) (providing that "a proceeding under this section shall be the sole and exclusive procedure for determining whether an alien may be admitted to the United States or, if the alien has been so admitted, removed from the United States").

No. 10-10751

same terms as federal immigration law, it seeks to use an alien's immigration status for a purpose different from that intended under the federal scheme.[61]

An alien's unlawful status and eligibility for removal does not *ipso facto* mean that the alien will be removed, as it would under the Ordinance. Instead, the federal government has broad discretion to cancel removal or adjust an alien's status under a variety of circumstances.[62] "In light of the discretionary federal power to grant relief from [removal], a State cannot realistically determine that any particular undocumented [alien] will in fact be [removed] until after [removal] proceedings have been completed."[63] Yet, the Ordinance here dispenses with the procedures and discretion of the federal scheme to preclude an alien from residence in the City solely due to a status classification as unlawful even though the same alien might be entitled to relief under the federal process. That is not permissible under the Constitution and the Supremacy Clause.

## III. Conclusion

This country has a large Latino population and millions of Latinos live here without legal permission. However, the great majority live quietly, raise families, obey the law daily, and do work for our country. For all that they

---

[61] *See, Plyler*, 457 U.S. at 225, 102 S. Ct. at 2399 (state regulation of aliens must "mirror *federal objectives*") (emphasis added).

[62] *See, e.g.*, 8 U.S.C. § 1229b(a) (providing Attorney General with discretion to cancel removal of an alien who is otherwise inadmissible or subject to deportation if alien meets specified requirements); § 1229b(b)(2) (providing Attorney General with discretion to cancel removal and adjust status of an alien who is a victim of domestic violence).

[63] *Plyler*, 457 U.S. at 226, 102 S. Ct. at 2399. We might add that we do not read any provision of the INA as contemplating that illegal aliens would be homeless during the process. *See Cent. Ala. Fair Housing Ctr. v. Magee*, 2011 WL 6010501, at *7 (M.D. Ala. Dec. 1, 2011) ("Congress never criminalized an alien's attempt to lawfully reside in his home; nor has Congress permitted States to regulate the residence of aliens. Instead, enforcement is left to the executive."); *see also* 8 U.S.C. § 1229(a)(1)(F) (requiring aliens in removal proceedings to provide an address where the alien may be contacted).

No. 10-10751

contribute to our welfare, they live in constant dread of being apprehended as illegal aliens and being evicted, perhaps having their families disrupted. As unsatisfactory as this situation is it is the immigration scheme we have today. Any verbal and legal discrimination against these people, as Farmers Branch exemplifies by this ordinance, exacerbate the difficulty of that immigration scheme. This is a national problem, needing a national solution. And it impacts the nation's relations with Mexico and other nations. The Supreme Court long ago pointed out in *Chy Lung* the problem for this country of treating Chinese people poorly.[64] And as the Court said in *Harisiades v. Shaughnessy*, "any policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government."[65]

Because the sole purpose and effect of this ordinance is to target the presence of illegal aliens within the City of Farmers Branch and to cause their removal, it contravenes the federal government's exclusive authority over the regulation of immigration and the conditions of residence in this country, and it constitutes an obstacle to federal authority over immigration and the conduct of foreign affairs. The ordinance is unconstitutional, and the judgment of the district court is affirmed.

AFFIRMED.

---

[64] 92 U.S. at 279.

[65] 342 U.S. 580, 588–89, 72 S. Ct. 512, 519 (1952).

No. 10-10751

## Appendix

## CITY OF FARMERS BRANCH
## ORDINANCE NO. 2952

**AN ORDINANCE PROVIDING FOR RESIDENTIAL OCCUPANCY LICENSES; PROVIDING FOR VERIFICATION OF ALIENS' IMMIGRATION STATUS WITH THE FEDERAL GOVERNMENT CONSISTENT WITH FEDERAL LAW; CREATING OFFENSES; PROVIDING FOR ENFORCEMENT; PROVIDING FOR JUDICIAL REVIEW; PROVIDING A PENALTY; PROVIDING A SEVERABILITY CLAUSE; AND PROVIDING AN EFFECTIVE DATE.**

**WHEREAS**, federal law prescribes certain conditions (found principally in Title 8, United States Code, Sections 1101, et seq.), that must be met before an alien may be lawfully present in the United States; and

**WHEREAS**, aliens not lawfully present in the United States, as determined by federal law, do not meet such conditions as a matter of law when present in the City of Farmers Branch; and

**WHEREAS**, pursuant to Title 8, United States Code Sections 1621, et seq., certain aliens not lawfully present in the United States are not eligible for certain State or local public benefits, including licenses; and

**WHEREAS**, Title 8, United States Code, Section 1324(a)(1)(A), prohibits the harboring of aliens not lawfully present in the United States, including, as the courts of the United States have held, the provision of residential accommodations to such aliens; and

**WHEREAS,** the City of Farmers Branch is authorized to adopt ordinances pursuant to its police power to protect the heath, safety, and welfare of its citizens; and

**WHEREAS**, the City of Farmers Branch is authorized to adopt regulations touching on aliens that are consistent with pertinent federal laws; and

**WHEREAS**, it is the intent of the City of Farmers Branch to enact regulations that are harmonious with federal immigration law and which aid in its enforcement; and

**WHEREAS**, it is not the intent of the City of Farmers Branch to alter, supplant,

24

No. 10-10751

disrupt, or interfere with federal immigration law; and

**WHEREAS,** the provisions of this ordinance shall be applied uniformly and in a nondiscriminatory manner, and the application of these provisions must not differ based on a person's race, religion, or national origin; and

**WHEREAS**, the City of Farmers Branch has complied with all prerequisites for the passage of this Ordinance; and

**WHEREAS**, the meeting at which this Ordinance was adopted was properly posted in accordance with the Open Meetings Act, and this Ordinance was considered and approved in an open meeting of the City Council with opportunity for public comment regarding its terms and provisions; and

**WHEREAS**, the purposes of this Ordinance are to promote the public health, safety, and general welfare,

**NOW, THEREFORE, BE IT ORDAINED BY THE CITY COUNCIL OF THE CITY OF FARMERS BRANCH, TEXAS:**

<u>Section 1:</u>   Chapter 26, Businesses, Article III, Single-Family Rental Housing, of the Code of Ordinances, City of Farmers Branch, Texas, is hereby amended by adding the following as Section 26-79:

**"Section 26-79. Citizenship or Immigration Status Verification**

**(A) <u>Definitions</u>**

The following terms and phrases, when used in this section, shall have the meanings ascribed to them in this section, and shall be construed so as to be consistent with state and federal law, including federal immigration law:

> (1) "Alien" means any person not a citizen or national of the United States, as set forth in Title 8, United States Code, Section 1101(3), as amended.

> (2) "Lessor" means a person who leases or rents a single family residence as or on behalf of a landlord.

> (3) "Occupant" means a person, age 18 or older, who resides at a single family residence. A temporary guest of an occupant is not an occupant for the purposes of this section.

No. 10-10751

**(B) Residential Occupancy Licenses**

(1) Prior to occupying any leased or rented single-family residence, each occupant must obtain a residential occupancy license.

(2) It is the occupant's responsibility to submit an occupancy license application to the building inspector, pay a fee of $5 to the City, and obtain a residential occupancy license. If there are multiple occupants seeking to occupy a single rental unit, each occupant must obtain his or her own residential occupancy license. Multiple applicants for occupancy of the same single family residence may designate one of their number as their agent to submit the required application forms, provided that each individual applicant signs his or her own application form. The building inspector may establish a procedure whereby an applicant (or designated agent) may submit the application forms), signed by the applicant(s), via facsimile or website portal.

(3) The lessor shall notify each prospective tenant of the requirements of paragraph (B)(2) of this section.

(4) A residential occupancy license is valid only for as long as the occupant continues to occupy the single family residence for which the license was issued. Any relocation to a different leased or rented dwelling unit requires a new residential occupancy license.

(5) An application for a residential occupancy license shall be made on a form furnished by the building inspector for such purpose. The form shall require the following information:

(a) full legal name of the occupant;

(b) mailing address of the occupant;

(c) address of the single family residence for which the occupant is applying, if different from the mailing address;

(d) name and business address of the lessor;

(e) date of lease or rental commencement;

(f) date of birth of the occupant;

No. 10-10751

(g) the occupant's country of citizenship;

(h) if the applicant is a United States citizen or national, a signed declaration that the applicant is a United States citizen or national; the form shall state that it is a crime under Title 18, United States Code, Section 1015(e), for a person to knowingly make any false statement or claim that he or she is, or at any time has been, a citizen or national of the United States, with the intent to obtain on behalf of himself or herself, or any other person, any Federal or State benefit or service;

-or-

(i) if the applicant is not a United States citizen or national, an identification number assigned by the federal government that the occupant believes establishes his or her lawful presence in the United States (examples include, but are not limited to: resident alien card number, visa number, "A" number, 1-94 registration number, employment authorization number, or any other number on a document issued by the U.S. Government). If the applicant does not know of any such number, he or she shall so declare. Such a declaration shall be sufficient to satisfy this requirement.

(6) Upon receipt of the completed application and the payment of the application fee as set forth above, the building inspector shall immediately issue a residential occupancy license. The building inspector shall not deny a residential occupancy license to any occupant who submits a completed application and pays the application fee.

(7) The information provided on an application may be disclosed to the federal government according to paragraph (D) of this section, pursuant to Title 8, United States Code, Section 1373.

**(C) Offenses**

(1) It shall be an offense for a person to be an occupant of a leased or rented single family residence without first obtaining a valid occupancy license permitting the person to occupy that single family residence.

(2) It shall be an offense for a person to knowingly make a false statement of fact on an application for a residential occupancy license.

No. 10-10751

(3) It shall be an offense for a person to create, possess, sell, or distribute a counterfeit residential occupancy license.

(4) It shall be an offense for a lessor to lease or rent a single family residence without obtaining and retaining a copy of the residential occupancy license of any and all known occupants.

(5) It shall be an offense for a landlord to fail to maintain at the landlord's residence or regular place of business a copy of the residential occupancy license of each known occupant of a leased or rented single-family residence, or to fail to make such copy available for inspection by the Building Inspector during regular business hours.

(6) It shall be an offense for a lessor to lease a single family residence without including in the terms of the lease a provision stating that occupancy of the premises by a person, age 18 or older, who does not hold a valid residential occupancy license constitutes an event of default under the lease.

(7) It shall be an offense for a landlord or any agent of a landlord with authority to initiate proceedings to terminate a lease or tenancy to knowingly permit an occupant to occupy a single family residence without a valid residential occupancy license. It is a defense to a prosecution under this paragraph that the landlord or agent has commenced and diligently pursued such steps as may be required under the applicable law and lease provisions to terminate the lease or tenancy.

## (D) <u>Enforcement</u>

The building inspector shall enforce the requirements of this section as follows.

(1) Promptly after issuance of a residential occupancy license to any occupant who has not declared himself or herself to be either a citizen or a national of the United States in accordance with paragraph (B)(5)(h) of this section, the building inspector shall, pursuant to Title 8, United States Code, Section 1373(c), verify with the federal government whether the occupant is an alien lawfully present in the United States. The building official shall submit to the federal government the identity and status information contained on the application for the residential occupancy license, along with any other information requested by the federal government.

No. 10-10751

(2) If the federal government reports the status of the occupant as an alien not lawfully present in the United States, the building inspector shall send the occupant, at the address of the single family residence shown on the application for residential occupancy license, a deficiency notice. The deficiency notice shall state that on or before the 60th day following the date of the notice, the occupant may obtain a correction of the federal government's records and/or provide additional information establishing that the occupant is not an alien not lawfully present in the United States. If the occupant provides such additional information, the building inspector shall promptly submit that information to the federal government. The occupant may also submit information directly to the federal government.

(3) If the federal government notifies the building inspector that it is unable to conclusively verify or ascertain the immigration status of the occupant, or that the federal government's determination of immigration status is tentative, the building inspector shall take no further action until final verification from the federal government concerning the immigration status of the occupant is received. The building inspector shall not attempt to make an independent determination of any occupant's lawful or unlawful presence in the United States. If the federal government notifies the building inspector that more information is required before the federal government can issue a final verification of the occupant's immigration status, or that the occupant may contest the federal government's determination of status, the building inspector shall notify the occupant accordingly.

(4) No earlier than the 61st day after a deficiency notice has been sent to an occupant, the building inspector shall again make an inquiry to the federal government seeking to verify or ascertain the citizenship or immigration status of the occupant. If the federal government reports that the occupant is an alien who is not lawfully present in the United States, the building inspector shall send a revocation notice to both the occupant and the lessor. The revocation notice shall revoke the occupant's residential occupancy license effective 15 days after the date of the revocation notice.

(5) If a landlord or the landlord's agent commits an offense under paragraph (C)(7) of this section, the building inspector shall suspend the landlord's rental license.

No. 10-10751

(6) During the period of suspension, the landlord shall not collect any rent, payment, fee, or any other form of compensation from, or on behalf of, any occupant or tenant in the single family residence.

(7) The suspension shall terminate one day after the landlord or the landlord's agent submits to the building inspector a sworn affidavit of the owner or agent stating that each and every violation of paragraph (C)(7) of this section on which revocation was based has ended. The affidavit shall include a description of the specific measures and actions taken to end the violation.

(8) The suspension of a landlord's rental license may be appealed to the city council pursuant to Section 26-78.

(9) The terms of this section shall be applied uniformly, and enforcement procedures shall not differ based on a person's race, ethnicity, religion, or national origin.

## (E) Judicial Review

(1) Any landlord or occupant who has a received a deficiency notice or a revocation notice may seek judicial review of the notice by filing suit against the building inspector in a court of competent jurisdiction in Dallas County, Texas.

(2) In the event that such a suit is filed prior to or within 15 days after the date of the revocation notice, if any, revocation is automatically stayed until final conclusion of judicial review.

(3) The landlord or occupant may seek judicial review of the question of whether the building inspector complied with the provisions of this ordinance or other relevant provisions of federal, state, or local law, or the question of whether the occupant is lawfully present in the United States, or of both such questions.

(4) In a suit for judicial review in which the question of whether the occupant is lawfully present in the United States is to be decided, that question shall be determined under federal law . In answering the question, the court shall be bound by any conclusive determination of immigration status by the federal government. A determination is

No. 10-10751

conclusive if, under federal law, it would be given preclusive effect on the question.

(5) The court shall take judicial notice of any verification of the citizenship or immigration status of the occupant previously provided by the federal government. The court may, and at the request of a party shall, request the federal government to provide, in automated, documentary, or testimonial form, a new verification of the citizenship or immigration status of the occupant pursuant to Title 8, United States Code, Section 1373(c). The most recent determination of the immigration status of an individual by the federal government shall create a rebuttable presumption as to the individual's immigration status.

**(F) <u>Construction</u>**

The requirements and obligations of this section shall be implemented in a manner fully consistent with federal law regulating immigration and protecting the civil rights of all citizens, nationals, and aliens."

<u>Section 2:</u>    Chapter 26, Businesses, Article III, Single-Family Rental Housing, of the Code of Ordinances, City of Farmers Branch, Texas, is hereby amended by adding the following as paragraph (f) of Section 26-78, Appeals to the City:

"(f) This section does not apply to any decision or order of the building inspector issuing a deficiency notice or a revocation notice with respect to a residential occupancy license pursuant to Sections 26- 79(D)(2) or 26-79(D)(4). Any such decision or order may be appealed only through a suit for judicial review pursuant to Section 26-79(E)."

<u>Section 3:</u>    Chapter 26, Businesses, Article IV, Apartment Complex Rental, of the Code of Ordinances, City of Farmers Branch, Texas, is hereby amended by adding the following as Section 26-119:

**"Section 26-119. Citizenship or Immigration Status Verification**

**(A) <u>Definitions</u>**

The following terms and phrases, when used in this section, shall have the meanings ascribed to them in this section, and shall be construed so as to

No. 10-10751

be consistent with state and federal law, including federal immigration law:

(1) "Alien" means any person not a citizen or national of the United States, as set forth in Title 8, United States Code, Section 1101(3), as amended.

(2) "Apartment" means a dwelling unit within an apartment complex.

(3) "Landlord" means the owner of an apartment.

(4) "Lessor" means a person who leases or rents an apartment as or on behalf of a landlord.

(5) "Occupant" means a person, age 18 or older, who resides at an apartment. A temporary guest of an occupant is not an occupant for the purposes of this section.

**(B) <u>Residential Occupancy Licenses</u>**

(l) Prior to occupying any leased or rented apartment, each occupant must obtain a residential occupancy license.

(2) It is the occupant's responsibility to submit an occupancy license application to the building inspector, pay a fee of $5 to the City, and obtain a residential occupancy license. If there are multiple occupants seeking to occupy a single apartment, each occupant must obtain his or her own residential occupancy license. Multiple applicants for occupancy of the same apartment may designate one of their number as their agent to submit the required application forms, provided that each individual applicant signs his or her own application form. The building inspector may establish a procedure whereby an applicant (or designated agent) may submit the application form(s), signed by the applicant(s), via facsimile or website portal.

(3) The lessor shall notify each prospective tenant of the requirements of paragraph (B)(2) of this section.

(4) A residential occupancy license is valid only for as long as the occupant continues to occupy an apartment within the same apartment complex as the apartment for which the license was issued. Any relocation to a leased

No. 10-10751

or rented single-family residence or to an apartment within a different
apartment complex requires a new residential occupancy license.

(5) An application a residential occupancy license shall be made on a form
furnished by the building inspector for such purpose. The form shall
require the following information:

(a) full legal name of the occupant;

(b) mailing address of the occupant;

(c) address of the apartment for which the occupant is applying, if
different from the mailing address;

(d) name and business address of the lessor;

(e) date of lease or rental commencement;

(f) date of birth of the occupant;

(g) the occupant's country of citizenship;

(h) if the applicant is a United States citizen or national, a signed
declaration that the applicant is a United States citizen or national; the
form shall state that it is a crime under Title 18, United States Code,
Section 1015(e), for a person to knowingly make any false statement or
claim that he or she is, or at any time has been, a citizen or national of the
United States, with the intent to obtain on behalf of himself or herself, or
any other person, any Federal or State benefit or service;

—or—

(i) if the applicant is not a United States citizen or national, an
identification number assigned by the federal government that the
occupant believes establishes his or her lawful presence in the United
States (examples include, but are not limited to: resident alien card
number, visa number, "A" number, I-94 registration number, employment
authorization number, or any other number on a document issued by the
U.S. Government). If the applicant does not know of any such number, he
or she shall so declare. Such a declaration shall be sufficient to satisfy this
requirement.

No. 10-10751

(6) Upon receipt of the completed application and the payment of the application fee as set forth above, the building inspector shall immediately issue a residential occupancy license. The building inspector shall not deny a residential occupancy license to any occupant who submits a completed application and pays the application fee.

(7) The information provided on an application may be disclosed to the federal government according to paragraph (D) of this section, pursuant to Title 8, United States Code, Section 1373.

**(C) <u>Offenses</u>**

(1) It shall be an offense for a person to be an occupant of a leased or rented apartment without first obtaining a valid occupancy license permitting the person to occupy that apartment.

(2) It shall be an offense for a person to knowingly make a false statement of fact on an application for a residential occupancy license.

(3) It shall be an offense for a person to create, possess, sell, or distribute a counterfeit residential occupancy license.

(4) It shall be an offense for a lessor to lease or rent an apartment without obtaining a copy of the residential occupancy license of any and all known occupants.

(5) It shall be an offense for a person responsible for the management of an apartment complex to fail to maintain on the premises of the apartment complex a copy of the residential occupancy license of each known occupant of the apartment complex, or to fail to make such copy available for inspection by the Building Inspector during regular business hours.

(6) It shall be an offense for a lessor to lease an apartment without including in the terms of the lease a provision stating that occupancy of the premises by a person, age 18 or older, who does not hold a valid residential occupancy license constitutes an event of default under the lease.

(7) It shall be an offense for a landlord or any agent of a landlord with authority to initiate proceedings to terminate a lease or tenancy to

No. 10-10751

knowingly permit an occupant to occupy an apartment without a valid residential occupancy license. It is a defense to a prosecution under this paragraph that the landlord or agent has commenced and diligently pursued such steps as may be required under the applicable law and lease provisions to terminate the lease or tenancy.

**(D) Enforcement**

The building inspector shall enforce the requirements of this section as follows.

(1) Promptly after issuance of a residential occupancy license to any occupant who has not declared himself or herself to be either a citizen or a national of the United States in accordance with paragraph (B)(5)(h) of this section, the building inspector shall, pursuant to Title 8, United States Code, Section 1373(c), verify with the federal government whether the occupant is an alien lawfully present in the United States. The building official shall submit to the federal government the identity and status information contained on the application for the residential occupancy license, along with any other information requested by the federal government.

(2) If the federal government reports the status of the occupant as an alien not lawfully present in the United States, the building inspector shall send the occupant, at the address of the apartment shown on the application for residential occupancy license, a deficiency notice. The deficiency notice shall state that on or before the 60th day following the date of the notice, the occupant may obtain a correction of the federal government's records and/or provide additional information establishing that the occupant is not an alien not lawfully present in the United States. If the occupant provides such additional information, the building inspector shall promptly submit that information to the federal government. The occupant may also submit information directly to the federal government.

(3) If the federal government notifies the building inspector that it is unable to conclusively verify or ascertain the immigration status of the occupant, or that the federal government's determination of immigration status is tentative, the building inspector shall take no further action until final verification from the federal government concerning the immigration status of the occupant is received. The building inspector shall not attempt to make an independent determination of any occupant's lawful or unlawful presence in the United States. If the federal government notifies

35

No. 10-10751

the building inspector that more information is required before the federal government can issue a final verification of the occupant's immigration status, or that the occupant may contest the federal government's determination of status, the building inspector shall notify the occupant accordingly.

(4) No earlier than the 61st day after a deficiency notice has been sent to an occupant, the building inspector shall again make an inquiry to the federal government seeking to verify or ascertain the citizenship or immigration status of the occupant. If the federal government reports that the occupant is an alien who is not lawfully present in the United States, the building inspector shall send a revocation notice to both the occupant and the lessor. The revocation notice shall revoke the occupant's residential occupancy license effective 15 days after the date of the revocation notice.

(5) If a landlord or the landlord's agent commits an offense under paragraph (C)(7) of this section, the building inspector shall suspend the landlord's apartment complex license.

(6) During the period of suspension, the landlord shall not collect any rent, payment, fee, or any other form of compensation from, or on behalf of, any occupant or tenant in the apartment complex.

(7) The suspension shall terminate one day after the landlord or the landlord's agent submits to the building inspector a sworn affidavit of the owner or agent stating that each and every violation of paragraph (C)(7) of this section on which revocation was based has ended. The affidavit shall include a description of the specific measures and actions taken to end the violation.

(8) The suspension of a landlord's rental license may be appealed to the city council pursuant to Section 26-118.

(9) The terms of this section shall be applied uniformly, and enforcement procedures shall not differ based on a person's race, ethnicity, religion, or national origin.

**(E) <u>Judicial Review</u>**

No. 10-10751

(1) Any landlord or occupant who has received a deficiency notice or a revocation notice may seek judicial review of the notice by filing suit against the building inspector in a court of competent jurisdiction in Dallas County, Texas.

(2) In the event that such a suit is filed prior to or within 15 days after the date of the revocation notice, if any, revocation is automatically stayed until final conclusion of judicial review.

(3) The landlord or occupant may seek judicial review of the question of whether the building inspector complied with the provisions of this ordinance or other relevant provisions of federal, state, or local law, or the question of whether the occupant is lawfully present in the United States, or of both such questions. The landlord or occupant may seek judicial review of the question of whether the building inspector complied with the provisions of this ordinance or other relevant provisions of federal, state, or local law, or the question of whether the occupant is lawfully present in the United States, or of both such questions.

(4) In a suit for judicial review in which the question of whether the occupant is lawfully present in the United States is to be decided, that question shall be determined under federal law. In answering the question, the court shall be bound by any conclusive determination of immigration status by the federal government. A determination is conclusive if, under federal law, it would be given preclusive effect on the question.

(5) The court shall take judicial notice of any verification of the citizenship or immigration status of the occupant previously provided by the federal government. The court may, and at the request of a party shall, request the federal government to provide, in automated, documentary, or testimonial form, a new verification of the citizenship or immigration status of the occupant pursuant to Title 8, United States Code, Section 1373(c). The most recent determination of the immigration status of an individual by the federal government shall create a rebuttable presumption as to the individual's immigration status.

## (F) Construction

The requirements and obligations of this section shall be implemented in a manner fully consistent with federal law regulating immigration and protecting

No. 10-10751

the civil rights of all citizens, nationals, and aliens."

Section 4: Chapter 26, Businesses, Article IV, Apartment Complex Rental, of the Code of Ordinances, City of Farmers Branch, Texas, is hereby amended by adding the following as paragraph (f) of Section 26-118, Appeals to the City:

> "(f) This section does not apply to any decision or order of the building inspector issuing a deficiency notice or a revocation notice with respect to a residential occupancy license pursuant to Sections 26-119(D)(2) or 26-119(D)(4). Any such decision or order may be appealed only through a suit for judicial review pursuant to Section 26-119(D)(9)."

Section 5: Penalty

> Upon conviction, any person committing any act or omission declared to be an offense under the provisions of this ordinance shall be fined in a sum not to exceed $500. A separate offense shall be deemed committed upon each day during or on which a violation occurs or continues.

Section 6: Severability

> The terms and provisions of this ordinance are severable and are governed by Section 1-12 of the Code of Ordinances, City of Farmers Branch, Texas, as amended. If the application of this ordinance to any person, entity, or circumstance is invalid, the invalidity does not affect other applications of the ordinance that can be given effect without the invalid application, since the same would have been enacted by the City Council without regard to any such invalid application.

*Section 7:* Effective Date

> This ordinance shall become effective on the 15th day after the date on which a final and appealable judgment is rendered by the United States District Court for the Northern District of Texas in the action styled *Villas at Parkside Partners d/b/a Villas at Parkside, et al. v. City of Farmers Branch*, Civil Action No. 3:06-CV-2371-L (consolidated with Civil Actions Nos. 3:06-CV-2376-L and 3:07-CV-0061-L). The city secretary is directed to, within 15 days after such a judgment is rendered, publish notice of the date on which this ordinance will take effect in the official city newspaper and on the city's website.

No. 10-10751

This ordinance applies only to leases or tenancies that commence on or after its effective date.

No. 10-10751

JENNIFER WALKER ELROD, Circuit Judge, concurring in part and dissenting in part:

This case is not about whether the City of Farmers Branch's housing Ordinance is a wise policy choice. It is not for judges to make that sort of political judgment. Nor do the plaintiffs argue on appeal that the Ordinance violates their individual rights. Instead, this appeal asks the narrow question of whether federal law preempts the Ordinance.

The majority concludes that the Ordinance is preempted as an impermissible regulation of immigration and implicitly preempted via conflict preemption. In crafting its conclusion, the majority conflates the distinct doctrines of regulation of immigration and conflict preemption. Because a straightforward application of Supreme Court and Fifth Circuit precedent yields a different result, I must respectfully concur in part and dissent in part. First, although the Ordinance no doubt concerns illegal immigrants, it is simply not a regulation of immigration as defined by the Supreme Court in *DeCanas*. Second, because the Ordinance explicitly defers to federal determinations of immigration status—similar to the statute the Supreme Court upheld last term in *Whiting*—it is not conflict preempted, with the exception of its separate judicial review provisions.

## I. Regulation of Immigration

In *DeCanas v. Bica*, 424 U.S. 351 (1976), Justice Brennan wrote for a unanimous Supreme Court holding that a state statute criminalizing the employment of illegal immigrants was not preempted by federal law. Before analyzing whether Congress had preempted the statute, the Court examined whether the law was "a constitutionally proscribed regulation of immigration that Congress itself would be powerless to authorize or approve." *Id.* at 356.

*DeCanas* began that constitutional inquiry with the principle that the "[p]ower to regulate immigration is unquestionably exclusively a federal power."

No. 10-10751

*Id.* at 354. "But the Court has never held that every state enactment which in any way deals with aliens is a regulation of immigration and thus *per se* pre-empted by this constitutional power, whether latent or exercised." *Id.* at 355. Thus, *DeCanas* made clear that what constitutes a "regulation of immigration" in the constitutional sense is not "the fact that aliens are the subject of a state statute." *Id.* Rather, the Court narrowly defined a regulation of immigration as "essentially a determination of who should or should not be admitted into the country, and the conditions under which a legal entrant may remain." *Id.*

Here, the majority concedes that the Ordinance does not determine the entry or exit of anyone into or out of the United States. This should be the end of the regulation of immigration inquiry. Yet the majority finds an application of the plain language of *DeCanas* to be too "literal and hypertechnical" and asserts two objections to the applicability of *DeCanas*'s definition here.[1]

First, the majority claims the Ordinance is a regulation of immigration because it may force illegal immigrants to relocate from Farmers Branch. This theory is inconsistent with Supreme Court precedent. Just last term, the Supreme Court upheld a state law revoking the licenses of employers that knowingly employ illegal immigrants, which effectively forces aliens to relocate by depriving them of employment. *Chamber of Commerce of U.S. v. Whiting*, 131 S. Ct. 1968, 1973 (2011); *see also DeCanas*, 424 U.S. at 355–56 (holding a state law criminalizing the employment of illegal immigrants is not a regulation of

---

[1] The majority also cites to later sections of *DeCanas* that discussed congressional intent for state regulation in order to limit the *DeCanas* definition of "regulation of immigration" to instances where Congress has granted permission for state regulation. Besides being exactly backwards in terms of federalism, the majority's suggested limitation is without textual basis as *DeCanas* only discussed congressional intent when discussing whether Congress implicitly preempted the law, not when deciding if it were a regulation of immigration preempted by the Constitution. *See DeCanas*, 424 U.S. at 361.

No. 10-10751

immigration).[2]  This circuit also has held that a Texas statute denying free
public education to children because of their status as illegal immigrants was not
preempted by federal law.  *See Doe v. Plyler*, 628 F.2d 448, 451–54 (5th Cir.
1980), *aff'd on other grounds sub nom. Plyler v. Doe*, 457 U.S. 202 (1982).[3]
Certainly, just like prohibiting employment, the exclusion from free public
education could effectively force illegal immigrants to relocate.  Yet neither of
these examples constitute a regulation of immigration under Supreme Court or
Fifth Circuit precedent.  Rather than following this binding precedent, however,
the majority bases its analysis on a Third Circuit opinion that has been vacated
by the Supreme Court.  *See City of Hazleton v. Lozano*, 131 S. Ct. 2958 (2011).

Second, the majority urges that the housing Ordinance is a regulation of
immigration because of the underlying intent of the lawmakers to impact federal
immigration law and aid in its enforcement.  However, the fact that the
lawmakers intended to aid the enforcement of federal immigration law does not
render an ordinance a regulation of immigration.  To the contrary, the Supreme
Court has observed that:

> Although the State has no direct interest in controlling entry into
> this country, that interest being one reserved by the Constitution to
> the Federal Government, unchecked unlawful migration might
> impair the State's economy generally, or the State's ability to
> provide some important service.  *Despite the exclusive federal control
> of this Nation's borders, we cannot conclude that the States are
> without any power to deter the influx of persons entering the United*

---

[2] Although this case deals with a city ordinance and not a state statute, no party argues
that the city-state distinction would make any difference to our analysis.

[3] In *Plyler*, this court held that the Texas statute was not preempted, but that it did
violate the children's equal protection rights under the Fourteenth Amendment. *Plyler*, 628
F.2d at 449–50.  The Supreme Court subsequently affirmed this court's equal protection
holding, without reaching the preemption issue. *Plyler*, 457 U.S. at 210 n.8, 230.
Consequently, this court's preemption holding remains the law in this circuit.  The majority
opinion entirely ignores our court's binding precedent.

No. 10-10751

*States against federal law*, and whose numbers might have a discernable impact on traditional state concerns.

*Plyler*, 457 U.S. at 228 n.23 (emphasis added). The majority's decision holds the exact opposite: that states have no power "to deter the influx" because any legislation with such an objective or effect would be an impermissible regulation of immigration.

Indeed, the majority broadly proclaims that "state and local laws that attempt to affect aliens will, with limited exceptions, be preempted by the national interest." This broad statement is directly contrary to Supreme Court precedent. *See, e.g.*, *DeCanas*, 424 U.S. at 355 (holding that "standing alone, the fact that aliens are the subject of a state statute does not render it a regulation of immigration"). It is also contrary to the facts of both *DeCanas* and *Whiting* where the state statutes not only mentioned immigration standards but predicated the penalty entirely on immigration status. *Id.* at 352 n.1; *Whiting*, 131 S. Ct. at 1973. Tellingly, the majority's only attempt to distinguish the Supreme Court's guidance that local governments have the power "to deter" is that the facts in *Plyler* did not deal with "state regulations that directly affect the entry or removal of illegal aliens, which is what the Ordinance in this case does." This of course begs the question whether a city's prohibition of rental housing directly affects entry or removal in a way that a statewide prohibition of employment or free public education does not.

Nor does the majority's collection of sundry statements by the mayor and city attorney stating an intent to deter illegal immigration transform the Ordinance into a regulation of immigration. In fact, the legislative history to the statute in *Whiting* stated it was designed "to stop illegal immigration" and that state political branches acted "because it is now abundantly clear that Congress finds itself incapable of coping with the comprehensive immigration reforms our

43

No. 10-10751

country needs."[4]  Ariz. Rev. Stat. § 23-212, Historical and Statutory Notes,
Governor's Transmittal Message (signing statement of Governor Janet
Napolitano).  Yet the presence of that legislative history did not affect the
statute's constitutionality.

For the above reasons, I disagree with the majority's holding that the
housing Ordinance is a "regulation of immigration."  The Ordinance concerns
illegal immigrants, but to no greater extent than other laws that the Supreme
Court has upheld.  "Thus, absent congressional action, [the Ordinance] would
not be an invalid state incursion on federal power." *DeCanas*, 424 U.S. at 356.

## II. Implied Preemption

Even though the housing Ordinance is not a regulation of immigration
preempted independently by the Constitution, congressional action may
nevertheless render the Ordinance invalid under the Supremacy Clause. *Id.*
The majority's opinion is unclear but appears to rest its implied preemption
holding on conflict preemption, stating that the Ordinance stands as an obstacle
to federal law.  However, last term the Supreme Court emphasized that
"[i]mplied preemption analysis does not justify a freewheeling judicial inquiry
into whether a state statute is in tension with federal objectives; such an
endeavor would undercut the principle that it is Congress rather than the courts
that preempts state law." *Whiting*, 131 S. Ct. at 1985 (controlling opinion of
Roberts, C.J.).[5]

---

[4] Although I generally eschew use of legislative history to determine a statute's intent,
I discuss it here because of the majority's reliance upon it.

[5] The implied preemption analysis received only four votes as Justice Thomas joined
the rest of the opinion and concurred in the judgment. *Whiting*, 131 S. Ct. at 1973.  Justice
Thomas has previously expressed disagreement with implied preemption jurisprudence more
generally. *See, e.g., Wyeth v. Levine*, 555 U.S. 555, 583 (2009) (Thomas, J., concurring) ("I
cannot join the majority's implicit endorsement of far-reaching implied pre-emption doctrines.
In particular, I have become increasingly skeptical of this Court's 'purposes and objectives' pre-
emption jurisprudence.  Under this approach the Court routinely invalidates state laws based

44

No. 10-10751

The majority first errs in not applying the presumption against preemption. In reaching its conclusion that the Ordinance is not entitled to the presumption because it regulates immigration, the majority asks and answers the wrong question: "because the prerogative of deciding which aliens may live in the United States belongs to the federal government, the Farmers Branch's Ordinance does not regulate in an area historically occupied by the states, and the district court correctly declined to afford it a presumption of validity."[6] Here, the Ordinance undisputably regulates rental housing—after all, it is the denial of a rental housing license that is the basis of the complaint. Therefore, the correct question is whether the power to regulate rental housing falls within a local government's historic powers. *DeCanas* illustrates that this is the correct inquiry. Even though the statute in *DeCanas* criminalized the employment of illegal immigrants, the Court analyzed the statute as *a regulation of employment*, not a regulation of immigration, and determined it would not presume that Congress "intended to oust state authority to regulate the employment relationship covered by [the INA] in a manner consistent with pertinent federal laws." *DeCanas*, 424 U.S. at 357. Because the majority does not contest that state and local governments have a long history of regulating

---

on perceived conflicts with broad federal policy objectives, legislative history, or generalized notions of congressional purposes that are not embodied within the text of federal law. . . . [I]mplied pre-emption doctrines that wander far from the statutory text are inconsistent with the Constitution.").

[6] The majority cites to *United States v. Locke*, 529 U.S. 89, 108 (2000) for the proposition that "an 'assumption' of nonpre-emption is not triggered when the State regulates in an area where there has been a history of significant federal presence." However, the Supreme Court has more recently held that "in *all* pre-emption cases, and *particularly* in those in which Congress has legislated . . . in a field which the States have traditionally occupied, . . . we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (internal quotation marks omitted) (emphasis added). Any possible tension between *Locke* and *Wyeth* need not be reconciled here because it is not essential to this preemption question.

No. 10-10751

rental housing, "[f]ederal regulation . . . should not be deemed preemptive of state regulatory power in the absence of persuasive reasons either that the nature of the regulated subject matter permits no other conclusion, or the Congress has unmistakably so ordained." *Id.* at 356 (quoting *Fl. Lime & Avocado Growers v. Paul*, 373 U.S. 132, 142 (1963)). The majority is simply incorrect that this strong presumption does not apply in this case.

In suggesting a conflict, the majority glosses over the Ordinance's requirement that city officials must give absolute deference to the determinations of the federal government.

> If the federal government notifies the building inspector that it is unable to conclusively verify or ascertain the immigration status of the occupant, or that the federal government's determination of immigration status is tentative, the building inspector shall take no further action until final verification from the federal government concerning the immigration status of the occupant is received. The building inspector shall not attempt to make any independent determination of any occupant's lawful or unlawful presence in the United States.

Farmers Branch, Tex., Ordinance 2952, § 1(D)(3). Here, Farmers Branch is powerless to make "any independent determination" of immigration status, which the Supreme Court called going "the extra mile" to avoid preemption. *Whiting*, 131 S. Ct. at 1981 (controlling opinion of Roberts, C.J.). In fact, the Ordinance mirrors the statutory language approved in *Whiting*. There, the Court emphasized that "the Arizona law expressly provides that state investigators . . . 'shall not attempt to independently make a final determination on whether an alien is authorized to work in the United States.'" *Id.* The Court concluded that "[a]s a result, there can by definition be no conflict between state and federal law." *Id.*[7] Moreover, not only does the Ordinance prohibit Farmers

---

[7] Rather than stand as an obstacle, Farmers Branch argues that its ordinance effectuates Congress's objectives and paves the way for enforcement of Congress's anti-harboring statute. 8 U.S.C. § 1324(a)(1)(A)(iii); *United States v. Shum*, 496 F.3d 390, 391–92

No. 10-10751

Branch from making any decision of immigration status, but the city officials must take no action if the federal government gives an inconclusive or even a tentative determination. *See Whiting*, 131 S. Ct. at 1982 ("[I]f the information provided under § 1373(c) does not confirm that an employee is an unauthorized alien, it means that the county attorney cannot satisfy his burden of proof in an enforcement action.").

Nevertheless, I agree that the judicial review portion of the housing Ordinance goes beyond what was approved in *Whiting* because it allows a state court to review whether the occupant is lawfully present, while giving the federal determination "a rebuttable presumption as to the individual's immigration status" and making conclusive only those federal determinations that "would be given preclusive effect on the question."[8] § 1(E)(4), (E)(5). Authorizing state courts to revisit federal determinations of immigration status opens the door for conflicting state-federal rulings on an immigrant's lawful status. This creates an obstacle to Congress setting out "the sole and exclusive procedure" for determining whether an alien may be admitted or removed from

_____

(5th Cir. 2007) (defining the four elements of a harboring violation as (1) an unlawfully present alien; (2) that the defendant conceals, harbors, or shelters; (3) while knowing or recklessly disregarding that the alien is unlawfully present; and (4) in a way that substantially facilitates the alien remaining in the United States). Local agencies may assist the enforcement of federal immigration law, *Lynch v. Cannatella*, 810 F.2d 1363, 1371 (5th Cir. 1987), and this circuit construes the anti-harboring provisions broadly. *See United States v. Rubio-Gonzalez*, 674 F.2d 1067, 1073 n.5 (5th Cir. 1982) ("Congress intended to broadly proscribe any knowing or willful conduct fairly within any of these terms that tends to substantially facilitate an alien's remaining in the United States illegally . . . ."). The Ordinance makes it easier to prove the anti-harboring element of a defendant's knowledge of the alien's unlawful status, removing potential doubt when a landlord leases an apartment.

[8] It is true that the Arizona law in *Whiting* also gave the federal determination in state court proceedings only a rebuttable presumption of lawful status. *Whiting*, 131 S. Ct. at 1981 n.7. It did so, however, "[a]fter specifying that a state court may consider 'only' the federal determination," thereby making it impossible "to establish unlawful status apart from the federal determination." *Id.* The Ordinance here does not similarly confine the state judicial inquiry, stating only that the court must use federal law and be bound by conclusive federal determinations having preclusive effect.

47

No. 10-10751

the United States.  8 U.S.C. § 1229a(a)(3).  Therefore, those portions of the Ordinance are conflict preempted by federal law.[9]

### III.  Conclusion

Although I share the majority's concern for the dignity of all persons, regardless of how they arrived in this great nation, the parties have only presented us the narrow legal question of whether federal law preempts Farmers Branch's Ordinance.  *See Alberti v. Klevenhagen*, 790 F.2d 1220, 1231 (5th Cir. 1986) (Brown, J., dissenting) ("We, and the lower federal courts, are courts of limited jurisdiction.  Our task is not to correct all social ills, however egregious they may seem to us as individuals.  The keys to the Kingdom are not in our hands.").

The Supreme Court and this circuit have foreclosed the reasoning of the majority opinion.  Until the Supreme Court provides different marching orders, the Ordinance is neither a regulation of immigration preempted by the Constitution nor (with the exception of the judicial review provisions) impliedly preempted by Congress.  Accordingly, I respectfully concur that § 1(E) and § 2(E) are conflict preempted, and dissent in all other respects.

---

[9] *See* § 6 ("If the application of this ordinance . . . is invalid, the invalidity does not affect other applications of the ordinance that can be given effect without the invalid application . . . .").

48